Robert V. BLACK, Jr., aka
Bob Black, Appellant,

v.

The STATE of Texas, Appellee.

No. 69648.

Court of Criminal Appeals of Texas,
En Banc.

May 29, 1991.

James M. Leitner, Houston, for appellant.

Bill Turner, Dist. Atty., Bryan and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

Appellant was convicted by a jury of the offense of capital murder. See V.T.C.A.

Penal Code sec. 19.03(a)(3). The jury returned affirmative findings to the two special issues submitted under Art. 37.071(b), and the trial judge assessed punishment at death.

### I.

Appellant does not challenge the sufficiency of the evidence to support his conviction, but, in his seventh point of error, he challenges the sufficiency of the evidence to support the jury's finding on the second punishment issue. Art. 37.-071(b)(2), V.A.C.C.P.[1] Appellant contends the evidence is insufficient to support the jury's affirmative answer to this issue. When deciding whether the evidence is sufficient to support the jury's finding, we must view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Art. 37.071(b)(2) beyond a reasonable doubt. See *Keeton v. State*, 724 S.W.2d 58 (Tex.Cr.App.1987), and cases cited therein. The jury is entitled to consider all evidence admitted at both phases of trial when deliberating on the special issues, *Huffman v. State*, 746 S.W.2d 212, 223 (Tex.Cr.App.1988), and we therefore review that evidence adduced at guilt/innocence and punishment.

Appellant was charged with employing someone to murder his wife. Testimony at trial revealed Sandra Black, appellant's wife, was killed by two gunshot wounds to her head on February 21, 1985. John Wayne Hearn, the man allegedly employed by appellant to commit the murder of Sandra, testified at trial and presented the most damaging evidence against appellant. Hearn first came in contact with appellant in October of 1984 when appellant answered an advertisement that Hearn had placed in Soldier of Fortune magazine. At this time, Hearn was living in Gainesville, Florida, and had an operation known as the World Security Group. Appellant, a former Marine who fought in Vietnam, was unemployed at the time and answered Hearn's ad for Vietnam Veterans and per-

1. Article 37.071(b)(2) reads:
 whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

sons with military experience for high risk assignment jobs.

Appellant and Hearn, also a former Marine, had several phone conversations before meeting on January 9, 1985, in Brazos County. Hearn was interested in purchasing appellant's gun collection because his security group was gathering weapons to send to the Contras in Nicaragua. During this meeting, appellant told Hearn he would have all the money he (appellant) needed if he did not have a wife and that he and a friend had planned to kill his wife.[2] Appellant eventually refused to sell his collection for the agreed price and later sent Hearn a cashier's check for one thousand dollars for his expenses.

Approximately three weeks later, appellant called Hearn and explained that his friend who was going to assist in the murder of his wife had backed out. Appellant asked Hearn if he would drive the second vehicle for him in his murder plan. Hearn eventually agreed to assist appellant and returned to Bryan on February 20, 1985. Appellant agreed to pay Hearn ten thousand dollars for his part in the commission of his wife's murder and one thousand dollars for his expenses.

On February 21, 1985, Hearn met appellant in a Safeway parking lot in Bryan. Hearn left his rental car in the lot and went with appellant to his home. Neither appellant's wife Sandra nor his only child Gary were home at the time. Appellant gave Hearn pieces of Sandra's jewelry as collateral for the $10,000.00 payment and Sandra's pistol which Hearn was to use to murder her. Appellant and Hearn then ransacked the house to give the appearance of a burglary,[3] and appellant left in his El Camino and ran errands with his son to give him an alibi. Hearn waited in the

dining room for Sandra to arrive home. While Sandra was moving between the dining room and the kitchen, Hearn shot her two times in the head, killing her.[4] He then drove away from the house using Sandra's van, went back to the Safeway where he left the van, got in his rental car and drove back to Houston where he caught the next plane back home.

Besides the actual facts of the offense set out *infra*, there was testimony during the first phase of trial that appellant discussed killing his wife with David Huber in the fall of 1984 so that he could be with his girlfriend, his first cousin Teresa Hetherington. Appellant suggested Huber could get Sandra in a choke hold to knock her out, pin her underneath her motorcycle in the shed, and then set the shed on fire while appellant and his son jumped on the trampoline. Appellant talked at least twice about burning his wife to death according to Huber. Appellant also suggested Huber could steal a truck and run over Sandra while she was out riding her motorcycle; or he could hit Sandra in the head with a baseball bat and dump her body and motor bike over a bridge; or he could fake a robbery or rape of Sandra and shoot her with one of appellant's guns. Huber did not believe appellant was serious about killing his wife because he thought appellant fantasized; but then appellant offered him payments for killing Sandra. As a result, Huber's friendship with appellant "cooled" in late December of 1984.

Gordon Matheson worked with appellant in the fall of 1984. He stated appellant hated his wife, was "obsessed" with his girlfriend Teresa, and often discussed his personal problems with him. Appellant asked Matheson to assist him in killing Sandra by driving a car which appellant could jump into after crashing Sandra's

---

**2.** Appellant told Hearn that he planned to hit his wife in the head and knock her out. He would then put her body in his El Camino, take the car out on Bypass 6 in Bryan, set the cruise control at 70 m.p.h., and then crawl from his vehicle into another one while guiding the El Camino into a bridge embankment. Hearn testified that appellant told him he wanted his and Sandra's house, the insurance money and his girlfriend.

**3.** Appellant made two proposals for killing his wife, neither of which was accepted as feasible by Hearn. First appellant suggested Hearn run

Sandra off the road when she was driving to her dog training classes. Hearn thought there was too much traffic on the specific road. So appellant suggested Hearn shoot Sandra while she was walking around the track at the local school. Hearn felt too many people would be around. The two eventually agreed to kill Sandra in her own home when she returned from work.

**4.** Hearn testified he was an expert in weaponry when he was a Marine.

van with her in it. If Sandra did not die in the crash, appellant told Matheson he would "beat her in the head with a club." Appellant offered Matheson one-half of a one hundred thousand dollar life insurance policy he had on Sandra for his participation in this killing.

Don Ballard sold appellant a one hundred thousand dollar insurance policy on his wife in late January 1985. Sandra paid for this new policy. Appellant's prior coverage on his wife had only been fifty thousand dollars. There was testimony the new policy became effective February 13, 1985, just eight days before Sandra's murder. Ballard stated appellant asked him on the way to Sandra's funeral whether the insurance would pay off, but that it is "not totally unusual" for someone to be concerned about insurance at that time.

At the punishment phase of trial, Mark Huber, David's brother, testified appellant discussed killing his wife with him as far back as 1982 or 1983. Appellant offered Huber five thousand dollars to kill Sandra and actually paid him five hundred dollars as a "downpayment." Appellant discussed how he wanted Sandra killed and suggested either shooting her or running her over with a truck. Huber never intended to participate in Sandra's murder, and two weeks later appellant rescinded this offer. David Huber was recalled as a witness by the State during punishment and he testified appellant told him he could clear his brother's debt by killing Sandra himself. David Huber also stated appellant discussed killing his girlfriend's husband by dumping him in an abandoned well and covering it with cement. There were two other witnesses who stated appellant had commented he wanted to kill his wife or his girlfriend's husband.

The victim's mother, Marjorie Eimann, testified at punishment appellant had physically thrown Sandra through a screen door during an argument approximately ten years ago. Apparently around that same time, appellant chased Sandra's mother from their home. The final witnesses for the State during punishment were from the Brazos County Jail where appellant was being held awaiting trial. A deputy sheriff testified he found maps of the jail and the surrounding grounds and wire in appellant's cell during a shakedown, implicating a possible escape attempt. Additionally, a fellow inmate testified appellant had talked about escaping.

The defense called numerous witnesses during the punishment phase in an effort to present mitigating evidence. Several of the witnesses had worked with appellant when he was an electrician and testified he had been a good worker. There was extensive testimony on appellant's involvement with the Boy Scouts not only while he was growing up but also with his son. Besides being an Eagle Scout, appellant earned numerous honors in scouting and had served as a Scout Master. Further testimony revealed appellant attended Texas A & M university for approximately two years, but quit school and joined the Marines. While in the Marines, appellant was awarded the Blues Award, meaning he was the distinguished Marine in his platoon. Appellant also served his country in Vietnam, but when he returned home to Bryan he was unemployed for three or four years during which time Sandra predominantly supported him. Other witnesses testified appellant, who was approximately 39 years old at the time of his trial, had not been a mean or vicious child, and he was helpful and understanding with one of his son's friends who suffers from a physical and emotional handicap. No psychiatric evidence was offered nor was appellant shown to have a prior criminal record. A Baptist minister testified he had been counseling appellant since Sandra's murder on a weekly basis until November of 1985 when he began monthly sessions. On the basis of this evidence, the jury answered affirmatively "there is a probability that [appellant] would commit criminal acts of violence that would constitute a continuing threat to society[.]" Art. 37.071(b)(2).

The issue of sufficiency of the evidence at punishment has been presented to this Court and discussed innumerable times, so we feel another extensive review of the caselaw in this area would not add to the jurisprudence of this state but would only serve to unnecessarily lengthen this opinion. For a thorough discussion of the case-

law see *Keeton,* 724 S.W.2d 58, and *Huffman,* 746 S.W.2d 212. In *Keeton,* we summarized the caselaw and presented a nonexhaustive list of factors to be considered by a jury when answering the second issue under Art. 37.071(b). Those factors were:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;
2. the calculated nature of the defendant's acts;
3. the forethought and deliberateness exhibited by the crime's execution;
4. the existence of a prior criminal record, and the severity of the prior crimes;
5. the defendant's age and personal circumstances at the time of the offense;
6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;
7. psychiatric evidence; and
8. character evidence.

See *Keeton,* at 61, and cases also cited. Additionally, it is axiomatic that the circumstances of an offense alone, if severe enough, can be sufficient to sustain an affirmative finding as to a defendant's future dangerousness. *Moreno v. State,* 721 S.W.2d 295, 302 (Tex.Cr.App.1986).

Utilizing the above factors from *Keeton* and noting the similarity of this case to *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr. App.1979), cert. denied, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 we hold the evidence is sufficient to support the jury's "yes" answer to the second punishment issue. This capital murder was a senseless and cold-blooded killing. Appellant hired a stranger to lay in waiting in his own home to kill his wife and assisted the trigger-man in ransacking his home to give the impression that a robbery or burglary had taken place. The crime's execution exhibited overwhelming evidence of forethought and deliberateness. The evidence showed appellant had considered killing Sandra for

several *years,* but he was unable to find anyone willing to kill his wife for a price. It was not until the fall of 1984 that appellant could find such an abhorrent person.[5] The record reflects months of premeditation on appellant's part before he hired Hearn to shoot his wife and careful planning of the offense once Hearn agreed to kill Sandra. Appellant created himself an alibi by running errands with his son prior to and during commission of the offense. There was evidence appellant set up this murder scenario so that his son would be the person to discover that Sandra, his mother, had been killed. Appellant paid Hearn in advance one thousand dollars cash for being the triggerman and gave Hearn Sandra's jewelry as collateral for the balance of nine thousand dollars which appellant plan to pay using the insurance proceeds from Sandra's life insurance policy.

The evidence also showed the calculated nature of appellant's acts. He purchased new insurance policies on himself and Sandra, which became effective eight days prior to her murder. Appellant's girlfriend's divorce was to become final February 23, 1985, just two days after Sandra's death. He secured himself an alibi and called his wife to be certain she would be home alone during that time. Every detail of the offense, which was to look like the doing of a mysterious third party, was carefully planned by appellant and Hearn.[6] There was no evidence appellant acted under the influence or domination of anyone.

Appellant points out there was no evidence appellant had committed prior criminal offenses, only that he had considered killing his girlfriend's husband. The State introduced limited evidence of past violent conduct of appellant, and there was no psychiatric evidence presented by either the State or appellant. This lack of evidence, however, is not dispositive. The record clearly indicates appellant committed this offense out of greed. While it is true he wanted to be with his girlfriend who was supposedly getting a divorce, ap-

---

5. At the time of trial, Hearn was serving a life sentence in Florida for killing his girlfriend's husband. Hearn also stated he had killed his girlfriend's brother-in-law. Both these offenses occurred just weeks prior to Sandra's killing.

6. There was evidence appellant was aware of the large number of unsolved murders in the Bryan area.

pellant wanted to kill his wife in 1982, two years before he met Teresa. Appellant told Hearn he would have all the money he needed if he did not have a wife. Appellant wanted the house and the insurance money. As we stated in *O'Bryan,* 591 S.W.2d at 480, "[a] more calculated and cold-blooded crime than the one for which appellant was convicted can hardly be imagined." The evidence from both phases of trial was sufficient to support the jury's affirmative answer to issue two at punishment. Appellant's seventh point of error is overruled. See and cf. *Anderson v. State,* 717 S.W.2d 622, 634 (Tex.Cr.App.1986) (calculated nature of offense indicated defendant's propensity to commit future acts of violence); *Moreno,* 721 S.W.2d at 302 (facts of offense alone sufficient to support affirmative answer); *Russell v. State,* 598 S.W.2d 238, 254–55 (Tex.Cr.App.1980) (facts of offense and prior criminal record "extremely probative" on issue two); and *Beltran v. State,* 728 S.W.2d 382, 390 (Tex. Cr.App.1987) (facts not inherently sufficient to support affirmative answer).

■ In his first point of error, appellant contends he was rendered ineffective assistance of counsel. During voir dire examination, the prosecutor incorrectly explained the first issue under Art. 37.071(b) [7] to eight prospective jurors without objection from defense counsel. Three of these eight veniremen were seated on appellant's jury without being challenged for cause by either party. Appellant contends he has met the two-prong test set out in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which establishes ineffective assistance of counsel, and therefore his death sentence should be vacated and reformed to life. [8]

To establish ineffective assistance of counsel at the guilt-innocence stage of a non-capital trial or at either the guilt-innocence or the punishment stage of a capital murder trial, a defendant must show: (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington.* [9] In *Hernandez v. State,* 726 S.W.2d 53 (Tex.Cr.App.1986), we held our constitutional provisions, specifically Art. 1, sec. 10, did not create a standard in ineffective assistance cases that is more protective of a defendant's rights than the standard established in *Strickland.* Thus, we adopted in full the *Strickland* standards in determining ineffective assistance and prejudice resulting therefrom. *Hernandez,* 726 S.W.2d at 56–57.

During his voir dire of the three veniremen actually seated on the jury, the prosecutor explained that the first punishment issue went to the conduct of Hearn, the man who actually pulled the trigger and killed the deceased. The prosecutor explained the State was not alleging appellant was the triggerman and distinguished appellant's and Hearn's conduct in this offense. The prosecutor explained that issue one asked whether Hearn's conduct was committed deliberately. Appellant's trial counsel never interjected an objection to these explanations, did not even attempt to correctly explain the application of issue one to the case, and did not challenge any of these jurors for cause or peremptorily. Appellant contends this inaction on the part of his counsel satisfies the first prong of the *Strickland* test.

We agree with appellant. Trial counsel's omissions could not have been the result of reasonable professional judgment but appear to be the result of a misunderstanding or ignorance of criminal procedure during

---

7. Article 37.071(b)(1) asks:
 whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result.

8. Appellant prays for the wrong relief. Ineffective assistance of counsel constitutes trial error and, therefore, if we sustained appellant's claim

he would receive a new trial. See Art. 44.29(c), V.A.C.C.P.

9. Compare *Ex Parte Cruz,* 739 S.W.2d 53 (Tex. Cr.App.1987) and *Ex Parte Walker,* 777 S.W.2d 427 (Tex.Cr.App.1989) holding that the standard set forth in *Ex Parte Duffy,* 607 S.W.2d 507 (Tex.Cr.App.1980), not the *Strickland* standard, applies to counsel's performance at the punishment stage of a non-capital trial.

the punishment phase of a capital murder. Appellant asserts that "if it was meant to be some form of trial strategy it lacked any plausible basis", and we are constrained to agree. The purpose of the issues under Art. 37.071(b) is to guide the jury when examining the culpability and conduct of the *individual defendant* so as to prevent a defendant in a capital case from being punished for the deliberate conduct of another. *Green v. State*, 682 S.W.2d 271 (Tex.Cr.App.1984). Allowing the prosecutor to explain to the jury that *Hearn's conduct* was the focus of issue one in *appellant's trial* could not have been a rational tactical decision which, in hindsight, only disadvantaged appellant. Cf. *Derrick v. State*, 773 S.W.2d 271 (Tex.Cr. App.1989). We conclude defense counsel's representation in this instance fell below an objective standard of reasonableness.

■ Having determined appellant's trial counsel's performance was deficient during voir dire, we must now determine whether appellant was prejudiced by this deficiency, the second prong of *Strickland*. The test for determining prejudice was enunciated in *Strickland, viz:*

... The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

466 U.S. at 694, 104 S.Ct. at 2068. Appellant "suggests that in a death penalty case where death is actually assessed, harm should be presumed as a matter of law if jurors were allowed to deliberate and possibly return an assessment of death based on a Constitutionally (sic) impermissible interpretation of the law that Appellant's counsel could have and should have corrected." We find this case is not one where we will

presume prejudice and forego an inquiry into the actual conduct of the trial.[10] Thus, we focus on the events of appellant's trial.

The prosecutor and the judge both informed the venire that the law governing this case would come from the court. The jury charge at punishment phrased the special issues in terms of appellant's conduct only. The trial court instructed the jury it could consider all evidence admitted at both stages of trial, but there was no instruction that the jury could consider Hearn's conduct when answering the special issues. Also, the prosecutor's argument at punishment correctly stated the law as to issue one. The prosecutor told the jury:

What facts do you have on special issue number 1; was the conduct of the Defendant that caused the death of the deceased committed deliberately?

We know from the evidence that this Defendant contemplated killing his wife for months. We know from the evidence that he weighed the consequences, that he was aware of unsolved murders in the area, he was unaware (sic) it was possible to kill and not get caught.

We know that in 1985 when he finally had the means and hands to accomplish this mission he had a week, seven days, bought that money order and the cashier's check on the 14th of February. He had seven days to back out. He never turned away from the choice he made in those seven days.

So, we know the answer to number 1 is yes, the conduct that caused Sandra Black's death was deliberate.

Appellant's counsel, likewise, did not argue the jury should consider the deliberateness of Hearn's conduct in answering issue one with respect to appellant.

Given the state of the record in this cause, we cannot conclude trial counsel's performance prejudiced appellant. Over-

10. In *United States v. Cronic*, 466 U.S. 648, 662, 104 S.Ct. 2039, 2048, 80 L.Ed.2d 657 (1984), the Supreme Court held "only when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance." The Court referred to the complete denial of counsel and the denial of the right of

effective cross-examination. In footnote 26, citing *Strickland,* the Court stated "[a]part from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt."

358

whelming evidence of appellant's deliberate and calculated conduct in this case was presented at the guilt/innocence stage of trial and reoffered at punishment. The trial judge correctly instructed the jury on the law applicable to this case at both phases of trial, and we generally presume the jury followed the trial judge's instructions as delineated in the charge. Appellant presents no evidence that the jury acted to the contrary. The jury arguments by both the State and the defense correctly stated the law and applied the facts thereto. In other words, appellant has failed to show there is a reasonable probability that, but for trial counsel's failure to object to the prosecutor's incorrect explanation during voir dire of punishment issue one, the jury would have answered issue one in the negative. Appellant fails to meet the second prong of the *Strickland* test, and we overrule his first poin. of error. See and cf. *Motley v. State*, 773 S.W.2d 283 (Tex.Cr. App.1989); *Derrick*, 773 S.W.2d 271; and *Meanes v. State*, 668 S.W.2d 366 (Tex.Cr. App.1983), cert. denied, 466 U.S. 945, 104 S.Ct. 1930, 80 L.Ed.2d 476 (1984).

In his second point of error, appellant contends he was not afforded the right to trial based on a validly existing indictment in contravention of the Fifth Amendment to the United States Constitution, Art. 1, sec. 10, of the Texas Constitution, and Art. 1.05, V.A.C.C.P. Appellant filed a motion to quash the indictment in this cause, which was orally denied by the trial judge at a pre-trial hearing on January 17, 1986. The order accompanying appellant's written motion to quash reflects, however, that the motion was *granted* on that same day.

Appellant argues that since the motion to quash was granted and the cause was never reindicted, the district court was without jurisdiction to try this case.

On March 7, 1988, the State filed an Agreement To Amend The Statement Of Facts to accurately reflect the trial court's ruling on appellant's pre-trial motion to quash. See Tex.R.App.Proc. 55(a). Appellant filed an affidavit evidencing his agreement that the record be amended to reflect his pre-trial motion to quash was denied. On that same day, the trial judge entered an order amending the record to reflect he denied appellant's motion to quash. The issue presented in appellant's second point of error is now moot, and therefore overruled.

■ Appellant's third and fourth points of error are closely related, if not identical, and he presents essentially the same argument for both, so we will address them together. In his third point of error, appellant contends he was "denied due process of law by the trial court refusing to rule on his motion for change of venue pre-trial, and basing the ultimate ruling on whether a jury could be, and was selected." Appellant's fourth point of error appears to be a restatement of his third; he contends he was "denied due process of law by the procedures used and the test utilized in denying [his] motion for change of venue." [11]

Appellant filed his motion for change of venue on January 6, 1986. Appellant alleged three grounds supporting his motion: (1) there had been extensive pre-trial pub-

11. Points of error three and four are multifarious. An "editorial comment" made in appellant's brief under both points briefly and adequately summarizes his arguments on these issues, *viz:* "BECAUSE the Judge refused to rule on the change of venue motion, and BECAUSE the Judge was going to set the test for whether a change of venue was proper to be whether a jury could be seated in the case; and BECAUSE the Judge did not handle the publicity issue of art. (sic) 35.16(a)(10) V.A.C.C.P.; and BECAUSE Appellant's Attorney allowed the State to control the way art. (sic) 35.16(a)(10) V.A.C.C.P. was used; and BECAUSE the State utilized art. (sic) 35.16(a)(10) V.A.C.C.P. to ensure that jurors the State did not want were challenged without

being prepared to answer the question negatively, and those he desired to retain prepped with great care to answer negatively, Appellant was denied due process of law[.]" Generally, this Court holds error is waived when a multifarious point of error or ground for review is presented. *Euziere v. State*, 648 S.W.2d 700 (Tex.Cr.App. 1983). Nevertheless, it has been the practice of this Court to address an appellant's multifarious contentions in cases where the death penalty has been assessed because of the severity of the sentence. See *Macias v. State*, 733 S.W.2d 192 (Tex.Cr.App.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988). We will address the point of error presented but not the multifarious grounds argued in the brief.

licity of his arrest and the facts surrounding his arrest; (2) the indictment charged him with capital murder; and (3) he cannot obtain a fair and impartial trial because a substantial segment of the persons who would be called for jury service had already decided his guilt or innocence and/or punishment. A hearing was held on appellant's motion on January 17, 1986, and at the conclusion of the presentation of evidence from both appellant and the State, the trial judge took the motion under advisement pending voir dire examination of the prospective jurors. Appellant did not object to this procedure. The trial judge subsequently denied appellant's motion on February 18, 1986, in an order which stated in pertinent part:

This Court previously announced, at a pre-trial hearing on January 17, 1986, the the defendant's Motion would be taken under advisement until Voir Dire examination commenced and there could be a determination whether or not Venirepersons had been adversely affected by pretrial publicity to such an extent the defendant could not receive a fair and impartial trial in Brazos County.

Eighty seven (87) Venirepersons were qualified for Voir Dire examination.

Individual Voir Dire examination of sixty-two (62) Venirepersons was conducted during a time span of fifteen (15) days and fourteen (14) prospective jurors, (i.e. 12 as jurors and 2 as alternates) were selected.

Appellant contends that under this Court's decisions in *O'Brient v. State,* 588 S.W.2d 940 (Tex.Cr.App.1979), and *Henley v. State,* 576 S.W.2d 66 (Tex.Cr.App.1978), the trial judge's action and the basis of his ruling on the motion for change of venue were erroneous. The precise issue in *Henley* was whether the trial court abused its discretion by not affording the defendant a pre-trial hearing on his timely filed motion for change of venue. This Court held in *Henley,* 576 S.W.2d at 73, the trial court deprived the defendant of due process by refusing, over the defendant's objection, to grant the defendant a pre-trial hearing to introduce evidence in support of his motion for change of venue because such refusal

precluded a determination of the community attitude toward the defendant. The trial judge, instead of granting a hearing, delayed his ruling on the venue motion pending successful selection of a jury. *Henley* noted that under this Court's decision in *Adami v. State,* 524 S.W.2d 693 (Tex.Cr. App.1975), and the Supreme Court's decision in *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the trial judge was "not precluded from utilizing voir dire to help gauge the 'community climate of opinion as to a defendant'; however, regardless of the successful qualification of a jury panel, the evidence adduced during the pretrial hearing on the venue motion may dictate that a change of venue be granted in order to assure the accused a fair and impartial trial." *Henley,* at 71. The *O'Brient* decision followed *Henley,* and this Court held, *inter alia,* that overruling defendant's motion for change of venue without affording him a pre-trial hearing violated due process. *O'Brient,* 588 S.W.2d at 942.

We find *Henley* and *O'Brient* are clearly distinguishable from our present cause. The constitutional infirmity in both those cases was that the trial judge refused to conduct a pre-trial hearing on the defendant's venue motion and based his ruling on the motion solely on whether a jury or jury panel could be successfully selected. The problem with making a determination on a venue motion based solely on voir dire is that the issue raised by the motion and its accompanying affidavits cannot be "fully and adequately tried through the more narrow jury voir dire procedure." *Henley,* at 72. In the case *sub judice,* the trial judge afforded appellant a pre-trial hearing on his venue motion, and appellant in fact presented testimony from ten witnesses in support of his motion at this hearing. Appellant was given the opportunity to fully litigate the issue of whether he could receive a fair trial in Brazos County. The trial judge did not commit the error of foregoing a pre-trial hearing on the change of venue motion, but merely delayed his ruling on the motion until after the voir dire examination. The trial judge did not

abuse his discretion by denying appellant's motion after the completion of voir dire, rather than after the pre-trial hearing. *Adami*, 524 S.W.2d at 703. Nor is it error for the trial judge to consider the voir dire examination of the prospective jurors when ruling on a change of venue motion. *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr.App. 1980), cert. denied, 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981) (instructive to consider voir dire examination); *Eckert v. State*, 623 S.W.2d 359 (Tex.Cr.App.1981) (consideration of voir dire examination on appellate review); and *Ussery v. State*, 651 S.W.2d 767 (Tex.Cr.App.1983) (review veniremen's knowledge of facts of case). We hold the trial judge did not abuse his discretion nor deprive appellant of due process by considering the voir dire of the prospective jurors when ruling on the venue motion or by holding in abeyance his ruling on appellant's venue motion until the conclusion of voir dire. Appellant's third and fourth points of error are overruled.

■ Appellant argues in his fifth point of error he was denied the effective use of his peremptory challenges by the trial court's limitation of his voir dire examination of prospective juror Mark Schulz. Appellant asserts the trial judge, by sustaining the prosecutor's objection to his questioning, improperly prevented him from exploring Schulz's propensity to assess the death penalty in a capital murder case. Schulz explained during questioning by both the prosecutor and defense counsel that he believed death was an appropriate penalty for a person guilty of committing murder. In his brief, appellant states he was attempting to discover whether this belief would influence Schulz in answering the special issues submitted during punishment pursuant to Art. 37.071(b), V.A.C.C.P., when the District Attorney's objection to his question was sustained. Appellant claims the District Attorney did not like his manner of questioning and "wished to restrict him to the way he would like the question asked."

The applicable portion of Schulz's voir dire is set out in Appendix 1. Examination of that voir dire shows that at trial appellant's counsel was allowed to thoroughly inquire into the area that, on appeal, he complains he was improperly restricted from addressing. Appellant's counsel was not prohibited from making inquiry into proper voir dire areas, and, in fact, was given the opportunity to fully question Schulz and determine whether he would be a suitable juror in this case. *Adams v. State*, 577 S.W.2d 717 (Tex.Cr.App.1979), reversed on other grounds, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). There was no limitation on defense counsel's inquiry of Schulz's views on issues applicable to this case. See *Smith v. State*, 703 S.W.2d 641 (Tex.Cr.App.1985). The trial court's sustaining of the State's objection neither improperly restricted defense counsel's voir dire of prospective juror Schulz nor prevented appellant from intelligently exercising his peremptory strikes. *Allridge v. State*, 762 S.W.2d 146 (Tex.Cr.App. 1988), stay denied, 488 U.S. 1026, 109 S.Ct. 835, 102 L.Ed.2d 968, cert. denied, 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1989). We hold there was no abuse of discretion by the trial judge in the conduct of voir dire, and appellant's fifth point of error is overruled.

■ In his sixth point of error, appellant contends the death penalty, imposed under the facts and procedure of this case, constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Art. 1, Sec. 13, of the Texas Constitution. Specifically, appellant points us to the error he raised in his first point of error in this appeal. Appellant contends that because of the unobjected-to misstatements of the law under Art. 37.071(b)(1) which occurred during voir dire of three jurors in this trial, these jurors may have considered Hearn's conduct in answering issue one on deliberateness. Therefore, he argues, his death sentence is unconstitutional as violative of the "individuality" requirement of our state and federal constitutions. *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr.App.1975), affirmed, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

Appellant argues the principles established in *Jurek, Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), were violated because the jury was not allowed to consider the particularized circumstances of this offense or his individual characteristics when deliberating at punishment, specifically on issue one. We cannot agree with appellant that the jury's consideration of the facts, circumstances, and characteristics of this offense and appellant individually was improperly limited or that the death penalty was arbitrarily imposed on the facts of this case. Our capital murder sentencing scheme already guides and focuses the jury's objective consideration of the particularized circumstances of this offense and offender. See discussion in *Jurek*, 428 U.S. at 268–274, 96 S.Ct. at 2954–57. The jury charge at punishment operated to narrow the jury's focus to the consideration of appellant's culpability, his conduct, and any mitigating circumstances through specifically tailored issues addressing "the conduct of the defendant, Robert Black, Jr.". Although there were two offenders in this case, this is not a case where a parties charge is necessary for a conviction at guilt/innocence since appellant was charged with employing another for remuneration to kill his wife. The jury was charged at guilt/innocence that Hearn was an accomplice as a matter of law and that appellant could not be convicted on his testimony alone but that Hearn's testimony must be corroborated. There also was no instruction on either the law of parties or accomplices at punishment thereby, coupled with the facts of this case, eliminating the possibility the jury considered Hearn's culpable conduct when answering issue one on appellant's culpable conduct.[12] The fact that the prosecutor improperly explained, without objection by appellant, punishment issue one to the three jurors during their voir dire examination does not invalidate the sentencing procedure in this cause. We find no constitutional infirmity and overrule appellant's sixth point of error.

In a supplemental brief, appellant raises two additional points of error.[13] In the first point, he contends he was sentenced to death in violation of his rights as guaranteed by the Eighth and Fourteenth[14] Amendments to the United States Constitution and Art. I, §§ 13 and 19 of the Texas Constitution. Appellant argues this violation occurred because his jury was not instructed that it could consider, and give effect to, the mitigating evidence offered at punishment "so that it could render a reasoned moral response as opposed to a strict adherence to the special issues submitted." *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Appellant asserts that failure to give such an instruction amounted to fundamental egregious error which denied him a fair trial, citing *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr. App.1984). Appellant readily concedes in addressing his second supplemental point of error that he did not object to the jury charge on this basis nor did he request such an instruction be included in the charge.[15] Thus, our initial question is whether this issue is preserved for our

---

12. We recognize that the law of parties is not applicable to the three punishment issues. *Rector v. State*, 738 S.W.2d 235 (Tex.Cr.App.1986). We note that no parties charge was given only to emphasize the jury could not have been misled as to whose conduct to consider when answering the first punishment issue.

13. Appellant has also filed a pro se supplemental brief raising an additional four points of error. Appellant has no absolute right to hybrid representation, and we therefore do not address these additional points. *Scarbrough v. State*, 777 S.W.2d 83, 92 (Tex.Cr.App.1989), and cases cited therein.

14. Appellant's supplemental brief actually cites "XIX", but it is clear from his brief that this is merely a typographical error.

15. In his second supplemental point of error, appellant contends his trial counsel was ineffective for failing to request a charge to the jury at punishment "that would have allowed and instructed the jury to fully consider and apply the mitigating circumstances presented in this case." Given what we hold as to appellant's first supplemental point of error, we find this point is without merit and overrule this point of error.

review. Because we believe it would have been futile for appellant to object to the charge or request the additional instruction under the law as established by this Court at the time of appellant's trial, see *post*, we hold appellant has not waived this issue for our consideration.

## II. A. Procedural Default

The constitutionality of our capital murder sentencing scheme as applied to individual defendants has been addressed numerous times by this Court, but the past issues raised have not necessarily addressed the precise issue before us today. We find, however, that these cases addressing the constitutionality of Art. 37.071 are not only instructive but also illuminating of this Court's treatment of mitigating evidence within the confines of section (b) of Art. 37.071. Thus, a review of these cases is appropriate.

The attack on the adequacy of the statute to address mitigating evidence appears to have begun with *Ex parte Granviel*, 561 S.W.2d 503, 516 (Tex.Cr.App.1978). In *Granviel*, the habeas corpus petitioner claimed Art. 37.071(a), as applied to him, was unconstitutional because it prevented the jury from considering his mental condition as a mitigating factor in relation to the special issues of Art. 37.071(b). The Court upheld the constitutionality of the statute finding that the only limitation on the evidence which may be considered at punishment is that the evidence be "relevant" to punishment. Thus, the jury may properly consider evidence admitted during both phases of trial, which would include petitioner's mental condition, whether it be considered "aggravating" or "mitigating". *Granviel*, 561 S.W.2d at 516.

In *Adams v. State*, 577 S.W.2d 717, 729 (Tex.Cr.App.1979), rev'd on other grounds, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581

the appellant took a different constitutional stab at Art. 37.071. Here, the appellant argued the statute was unconstitutional because the special issues did not allow for the jury's consideration of the concept of "desert" or for leniency even if the special issues were answered affirmatively. The Court held Art. 37.071 was not unconstitutional for either reason and reiterated that the punishment issues provided guidance to the jury regarding all relevant evidence concerning the particular offense and the individual offender. *Id.* at 730.

An issue tangential to the one confronting us today was addressed by this Court in *Quinones v. State*, 592 S.W.2d 933 (Tex. Cr.App.1980), cert. denied, 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121, reh'g. denied, 449 U.S. 1027, 101 S.Ct. 600, 66 L.Ed.2d 490 (1980). At punishment, the appellant presented mitigating circumstances, "including a broad discussion of his personal and family background." [16] The appellant submitted two jury charges which incorporated the following language:

> Evidence presented in mitigation of the penalty may be considered should the jury desire, in determining the answer to any of the special issues.[17]

The appellant argued the additional jury charges were necessary to protect his right to the jury's consideration of mitigating circumstances when deciding whether to impose the death penalty. The trial court denied the charges and submitted the special issues under Art. 37.071(b) without elaboration.

On direct appeal, this Court disagreed with the appellant that the additional charges were necessary because our capital murder sentencing scheme assured that "the jury [will] have before it all possible relevant information about the individual defendant whose fate it must determine." *Quinones*, 592 S.W.2d at 947, citing *Jurek*

---

**16.** The opinion does not state specifically or more descriptively the contents of the appellant's mitigating evidence. See *Quinones*, 592 S.W.2d at 947.

**17.** In *James v. State*, 805 S.W.2d 415, n. 3 (Tex. Cr.App. No. 69,653 delivered October 31, 1990) (Opinion on Remand from the United States

Supreme Court), Judge Clinton notes "Quinones did not raise, nor did we decide, whether he was entitled to an instruction explaining to the jury how it may give effect to any evidence that has potentially mitigating weight and significance independent of its applicability to special issues." 805 S.W.2d at 417.

*v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976). Noting that the appellant presented mitigating evidence to the jury, the Court found the special issues were not so complex that the jury could not "readily grasp the logical relevance of mitigating evidence to the issue of whether there is a probability of future criminal acts of violence." *Quinones*, at 947. Thus, the additional, explanatory charge was not required to keep the jury from disregarding the appellant's mitigating evidence. *Id.*

The Court again relied on *Jurek*, 428 U.S. 262, 96 S.Ct. 2950, to find that specific jury instructions about mitigating factors were not constitutionally mandated as long as the jury was able to consider those factors when deliberating on the special issues. *Lackey v. State*, 638 S.W.2d 439, 455 (Tex.Cr.App.1982), reversed on reh'g on other grounds. Lackey requested several instructions on mitigation of punishment. Specifically pertinent to the cause *sub judice*, he wanted to ask the jury if mitigating factors outweighed aggravating factors or if there were insufficient mitigating circumstances to call for leniency.[18] Failure of the trial court to make such inquiry, appellant contended, violated the Eighth and Fourteenth Amendments. The Court concluded that "essentially" this same contention was rejected in *Jurek*, 428 U.S. 262, 96 S.Ct. 2950, and again recognized the constitutionality of Art. 37.071 since it allowed for consideration of mitigating factors. *Lackey*, 638 S.W.2d at 455.

In *Stewart v. State*, 686 S.W.2d 118 (Tex. Cr.App.1984), cert. denied, 474 U.S. 866, 106 S.Ct. 190, 88 L.Ed.2d 159 (1985), the appellant contended Art. 37.071 was unconstitutional because it contained no provisions "directing and instructing the jury's consideration of mitigating circumstances at the punishment phase of trial." *Id.* at 121. The appellant relied upon *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738

(1979), and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), to support his contention. These Supreme Court cases discussed capital sentencing schemes which precluded mitigating evidence from the jury's consideration. This Court noted our sentencing scheme did not suffer such constitutional defect, *Jurek*, 428 U.S. 262, 96 S.Ct. 2950, as it allowed the jury to consider whatever mitigating evidence the defense brought before it. Furthermore, following *Quinones*, 592 S.W.2d 933, this Court reiterated that no jury charge regarding mitigating evidence was necessary under Art. 37.071(b). Finally, and almost as an afterthought, the Court noted that the appellant had not requested a jury charge on mitigation.

In *Stewart*, 686 S.W.2d at 125, Judge Clinton filed an opinion, in which Judges Teague and Miller joined, dissenting to the Court's resolution of this point of error. Judge Clinton recognized the "paradox" of "truly 'mitigating' evidence"—that is, while it militates against a death sentence, it has "tremendous specific probative weight" in favor of answering "yes" to the punishment issues. Judge Clinton added further at 126:

> ... [A] defendant is entitled to jurors whose consideration of mitigating circumstances is not limited to whether that evidence does or does not indicate future dangerousness. The jury must not be precluded in law or in practice from according independent weight to factors that are mitigating but perhaps irrelevant to the probability issue of future dangerous conduct. [Citations omitted] ... [A] majority of this Court has blithely said, time and again, that in considering whether to impose a death sentence the jury must be allowed to consider whatever evidence of mitigating circumstances the defense can bring before it. But they also have repeatedly denied the utility, much less necessity, of informing the jury that they *may* so consider that evidence.

---

**18.** The Court addressed the merits of Lackey's contention even though it was raised in a multi-farious ground of error.

If we are to ensure the constitutionality of 37.071, we must not only give lip service to broadly *interpreting* it; we must also apply it as interpreted. This could easily be effected by requiring a jury instruction on mitigating evidence. (emphasis in original)

Judge Clinton also counseled that a jury charge on mitigation should be requested. *Id.* at 126, n. 4.

It is obvious from this review of caselaw that after *Stewart* (rehearing was denied February 6, 1985) even if a defendant had requested such an instruction during the punishment phase of his trial it would have been an effort in futility.[19] This Court had clearly established, by the *Stewart* case, that regardless of whether an objection was made to the charge or whether special mitigation instructions were requested, the defendant was not entitled to any jury instructions on mitigating evidence beyond that encompassed in Art. 37.071(b)(2), and a majority of this Court was not willing to retreat from that position.[20]

As just noted, the *Stewart* decision was delivered in September of 1984 and motion for rehearing was denied by this court in February of 1985. Appellant in the present cause was tried in February of 1986. Given the settled state of the case law at the time of appellant's trial, we refuse to fault him or his attorney for failing to object to the jury charge at punishment or request an instruction informing the jury it may give effect to the mitigating evidence presented at trial. Under the established precedent, the trial judge would have been correct in overruling the objection or denying the additional instruction, and clearly the defendant would not have been granted relief from this Court on direct appeal. Thus, we hold that for this case (and indeed for all cases tried after February 6, 1985) there was no procedural default and now proceed to address the merits of appellant's claim.

## II. B. Merits

■ Appellant relies of course on the Supreme Court's recent decision in *Penry v. Lynaugh*, 109 S.Ct. 2934, to support his contention that his death sentence was imposed in an unconstitutional manner.[21] In *Penry*, the Supreme Court determined that Art. 37.071(b) was unconstitutional as applied to Penry because the punishment issues did not provide the jury with a vehicle to express its "reasoned moral response" to his mitigating evidence of mental retardation and childhood abuse, and therefore the jury could not give mitigating effect to that evidence. The High Court agreed with Penry that his mitigating evidence had relevancy to his moral culpability beyond the scope of the special issues, and thus, an instruction "informing the jury that it could consider and give effect to mitigating evidence ... by declining to impose the death penalty" was necessary. *Penry*, 109 S.Ct. at 2952.

At the punishment stage of his trial, appellant called several witnesses who testified that he was a good employee as an

---

**19.** See also *Johnson v. State*, 691 S.W.2d 619, 627 (Tex.Cr.App.1984) (Clinton, J. concurring), cert. denied, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 152 (1985), wherein Judge Clinton, with Judge Miller joining, recognizes the futility of even dissenting to the majority's continued failure to provide sentencing juries with guidance on mitigating evidence.

**20.** Besides the cases discussed *supra,* see also *Fierro v. State*, 706 S.W.2d 310 (Tex.Cr.App. 1986), where the Court finds the ground of error is multifarious and there was no objection or specially requested instruction, but addresses the merits of the contention anyway. The Court says Art. 37.071 is constitutional because it allows the jury to consider mitigating factors, which were offered and argued to the jury in this case, and there was no showing the jury was prevented from considering them. *Clark v. State*, 717 S.W.2d 910 (Tex.Cr.App.1986), cert. denied, 481 U.S. 1059, 107 S.Ct. 2202, 95 L.Ed.2d 857, no objection to punishment charge or requested instruction. The Court says a majority of this Court has long held it is not error to not instruct the jury to consider and weigh mitigating factors when answering the special issues; the Court declined to further address the issue.

**21.** Appellant also takes heed of our decision in *Pierce v. State*, 777 S.W.2d 399 (Tex.Cr.App. 1989), cert. denied, — U.S. —, 110 S.Ct. 2603, 110 L.Ed.2d 283, and specifically sets forth how the two punishment issues failed to allow for a complete consideration of his mitigating evidence.

electrician. Appellant was also very involved with the Boy Scouts as a child and an adult and had attained the highest level of adult volunteer involvement. Also see discussion *supra* at p. 354. There was testimony that appellant was not a vicious child during his formative years, and, more recently, that he was helpful and understanding with one of his son's friends who had a medical problem. Appellant's parents testified to his involvement in the Marines and the Vietnam War. Appellant's father served in the military during World War II and had been a prisoner of war, which experience he feels may have influenced the way he raised appellant, although he was a POW prior to the time he married appellant's mother.

After once again reviewing the evidence presented by appellant during punishment, we conclude that this mitigating evidence is qualitatively different from that in *Penry*. Appellant's mitigating evidence suggests that he is generally a benevolent and nonviolent individual and that the commission of this offense was an aberration. This evidence had relevancy directly within the scope of the second punishment issue and was truly mitigating. We determine that an additional instruction was not needed so that the jury could express its "reasoned moral response" in answering the punishment issues. We hold no constitutional violation is presented. Appellant's first supplemental point of error is overruled.

Finding each of appellant's points of error to be without merit, we affirm the judgment of the trial court.

CLINTON and MALONEY, JJ., dissent to Part II.B.

## APPENDIX

From statement of facts:

Q. (from appellant's counsel) I was just asking how you would feel about someone what you had found guilty of capital murder. Would you already feel that they should get the death penalty because you have already told me someone guilty of plain murder should get the death penalty. So, you have just found them guilty of a capital murder, would you feel they were always deserving of the death penalty based on your beliefs?

A. Yes.

Q. So, is it a fair statement to say that you would be predisposed to answer these questions yes, based on that?

A. Define predisposed.

Q. You would already have a bias or prejudice toward finding the many the death penalty by answering these questions yes?

A. (No response from the venireperson.)

Q. Let me put it another way. Would it influence you in how you voted on those three questions?

A. To the best of my ability I would say right now no, because as I said, I would have to set those aside and go with what the law stated. And I feel like to say otherwise, you know, I mean everybody has their own personal beliefs on different things. And the best anybody could do is set those aside as best they could.

Q. Here again we're in a very serious situation and I think you can appreciate that from my client's standpoint. And how you answer it has no bearing on you type of person or anything of that nature and please don't think that's what I'm trying to infer or anything. I'm just trying to make sure that whoever is sitting in that jury box, if they find my client guilty can then also go in and answer these three questions and give my client—making the State prove beyond a reasonable doubt all three of these questions, and *I'm trying to determine with your attitude toward the death penalty and toward the question number two that we've talked about. It seems to me that there's a possibility that that could influence your decision on my client's getting the death penalty or not, and that's what I'm trying to get to, and only you can answer that and it's extremely important. So, if you feel that there is a probability, possibility, whatever, that it could influence your decision, I need to know?*

MR. TURNER: Your Honor, I'll object to that question. By the time they got to the

second phase he has already heard all the evidence of the case and he's instructed he can consider that. So, certainly it should have some kind of influence or bearing on his decisions in the case and to ask otherwise is an improper question and an improper inference under the law and I object to for that reason.

MR. SWIM: Your Honor, I don't think it is improper. The prospective witness has stated that if it was his—his beliefs would be that a normal murder case should also be receiving the death penalty. He has also agreed that a death penalty case is more serious than a murder case as defined by the law in Texas. And what I'm trying to get at is is there any—you know, once he has found a man guilty of capital murder when he feels in his own heart there's nothing wrong with his feelings, that a murder defendant should get the capital punishment, would he be predisposed to find that a capital murder, the death penalty and I don't thing I'm being improper at all.

MR. TURNER: Your Honor, my objection to that question he's taking the juror completely out of the context of being a juror. He said now if you just had it your way, if you were deciding out on the street. He is taking the juror completely out of the context of being a juror and having them to swear to follow the law and the oath that the Judge gives him. And trying to say if he had it on his own out in the street and jurors are not expected to act same on the street as they are in the courtroom. In the courtroom they are expected to follow the law.

THE COURT: Objection sustained, as to that part of the question.

Q. (By Mr. Swim) Mr. Schulz, assuming that you're a juror, you've taken all the oaths. Only you can answer whether or not back at this stage of the trial and let me refresh where we are since we had this interruption. We're at the stage where you, as a juror, have taken your oath, have heard the evidence and decided that the Defendant is guilty of capital murder, any Defendant, any capital murder. Then it's also up to you to decide the answers to these three questions as a juror, and that's what I meant awhile ago, I hope you didn't misunderstand me. You've already stated that you feel you have very strong feeling toward the death penalty.

A. Uh-huh.

Q. You've already stated that you feel that question number two goes a little bit further than you would require.

A. That's correct.

Q. *Based on those two things sitting, as a juror, are you sure that it would not influence your verdict in answering these three questions, those attitudes and considerations?*

A. Sitting as a juror, I would have to go with what the law instructed and I—you know, to the best of my ability, I would put those things aside and decide based on the requirements of the law.

Q. *Do you think it would be fair to say that it would take less proof to convince of these with those attitudes?*

A. It depends, I imagine, on the definitions of some of those phrasings and those questions how strictly you want to interpret them. I would do my best to apply the law, apply the facts and what was presented to those as the requirements of that question dictate.

Q. If possible, Mr. Schulz, I need a yes or no.

A. Can you ask the question again.

Q. *Based on your beliefs on the death penalty, your feelings of that question number two, would you require less from the State to answer these questions?*

A. Less than—the question?

MR. TURNER: Less than what, Your Honor? He hasn't given quantitative answers. Less than what?

MR. SWIM: Your Honor, if Mr. Turner will give me a chance to finish the question.

MR. TURNER: He stopped the question. The man started trying to answer it. He's not giving him a full question to answer.

THE COURT: Go ahead and finish your question, Mr. Swim.

*Q. (By Mr. Swim) Less than the burden of proof required upon the State?*

A. No.

*Q. So, you think, realizing the seriousness of this situation, you can commit to us that if you're selected as a juror that after the guilt/innocence stage, if you have found the Defendant guilty, that you will take no predisposition based on your thoughts of the death penalty and your feelings of that question number two in answering these questions?*

A. That is correct.

Q. You will strictly follow exactly what the Judge gives you?

A. I will do that, I would do that.

Q. And here again, you don't feel that these predispositions about these questions about the death penalty would influence you following that law?

A. Not from following the law.

Q. I'm not saying prevents you if following the law. I'm saying, influence you in following the law?

A. I can't really say I understand that, what exactly you're saying. I mean they would not influence me as to how I was instructed to follow the law.

[Emphasis supplied].

CAMPBELL, Judge, concurring.

In this concurrence, I present a more expansive view as to possible exceptions to the rules of procedural default under Texas law, than the futility doctrine addressed in part II.A of the plurality opinion. The plurality offers ample reasons and precedent to conclude that "it would have been futile for appellant to object to the charge or request the additional instruction under the law as established by this Court at the time of trial." Op. at 364. I offer my view of what I believe to be the more viable of the two components of the "right not recognized" doctrine—novelty.

I. The "Right not Recognized" Doctrine and the Contemporaneous Objection Rule.

■ Texas law generally requires that a specific contemporaneous objection be made at trial in order to preserve error for appellate review. An appellate or reviewing court will not consider an error which the defendant could have, but did not, call to the attention of the trial court at the time the error could have been avoided or corrected through appropriate action. *Rogers v. State*, 640 S.W.2d 248, 264 (Tex.Cr.App.1982). The contemporaneous objection rule also applies to constitutional questions. *Williams v. State*, 773 S.W.2d 525, 529 (Tex.Cr.App.1988); *Crawford v. State*, 617 S.W.2d 925, 929 (Tex.Cr.App.1981).[1]

Since *Penry*, numerous litigants before this Court have attempted to excuse their failure at trial either to request a special instruction on mitigating evidence or to object to the lack of such an instruction on the basis of the "right not recognized" exception to the contemporaneous objection rule discussed in *Ex parte Chambers*, 688 S.W.2d 483, 486 (Tex.Cr.App.1984) (Campbell, J., concurring). The concurring opinion, joined by five other members of the Court, addressed the issue of whether Chambers had waived constitutional error by failing to make a timely objection to evidence admitted contrary to the holding in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (Admission of psychiatrist's testimony on future dangerousness of defendant violated defendant's Fifth and Sixth Amendment rights to counsel when, after indictment and appointment of counsel, he was examined for competency by psychiatrist, without the knowledge of counsel, and his statements were the basis for the later testimony).

The concurrence in *Ex parte Chambers* explained that the *Smith* decision was to be applied retroactively, and that the con-

---

1. *See also Zillender v. State,* 557 S.W.2d 515, 517 (Tex.Cr.App.1977).

The generally acknowledged policies of requiring specific objections are two-fold. First, a specific objection is required to inform the trial judge of the basis of the objection and afford him the opportunity to rule on it. Second, a specific objection is required to afford opposing counsel an opportunity to remove the objection or supply other testimony.

temporaneous objection rule had not been applied to *Smith* error in the past. 688 S.W.2d at 485. The concurrence also noted that this Court strictly applied the contemporaneous objection rule in a previous non-capital direct appeal, therein adopting the constitutional waiver rule enunciated by the United States Supreme Court in *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). *See Parker v. State,* 649 S.W.2d 46 (Tex.Cr.App.1983).

The concurrence then identified the two possible components of the "right not recognized exception"; (1) the "futility" doctrine, *see* Op. at 364–366; *see Engle v. Isaac, supra,* (rejecting the futility of raising a constitutional claim as an excuse for state procedural default for purposes of federal habeas review); and (2) the "novelty" doctrine as stated in *Reed v. Ross,* 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984). The concurrence ultimately surmised that while instructive, neither the decision in *Engle* or *Reed* was binding on this Court. Moreover we argued that:

> [o]f equal significance to this writer is *this* State's own procedural default rule.... The rules enunciated in *Engle v. Isaac* and *Reed v. Ross* concern the exercise of federal jurisdiction once a State procedural default has been shown. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). I do not interpret these cases as attempting to impose a federal procedural waiver standard to be used by State courts.

This Court has for at least twelve years held that a defendant has not waived his right to assert a constitutional violation by failing to object at trial if at the time of his trial the right had not been recognized. *Ex Parte Taylor,* 484 S.W.2d 748 (Tex.Cr.App.1972); *Ex Parte Sanders,* 588 S.W.2d 383 (Tex.Cr.App. 1979); *Ex parte Casarez,* 508 S.W.2d 620

(Tex.Cr.App.1974); *Boulware v. State,* 542 S.W.2d 677 (Tex.Cr.App.1977); *Cuevas v. State,* 641 S.W.2d 558 (Tex.Cr.App. 1982). In view of these cases decided by this Court and in view of the extension by the Supreme Court of the doctrine in *Engle v. Isaac* to its current posture in *Reed v. Ross,* I would reaffirm the holding in *Cuevas, supra,* that "where a defect of constitutional magnitude has not been established at the time of trial, the failure to object does not constitute waiver", and I would overrule *Parker, supra,* to the extent that it is in conflict.

688 S.W.2d at 486 (emphasis in original).[2]

Thus, the Texas "right not recognized" exception excuses a failure to contemporaneously object when either; the claim was so novel that the basis of the claim was not reasonably available at the time of trial, or, the law was so well settled by this Court that an objection at that time would have been futile.

## II. The Novelty Half of the "Right not Recognized" Doctrine.

 The novelty aspect of the "right not recognized" doctrine was best articulated in *Reed v. Ross,* 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984). In *Reed,* the Supreme Court held that the "cause" prong of the "cause and prejudice" test for obtaining federal habeas relief could be satisfied when the procedural failure of counsel to raise a constitutional issue was not the result of a tactical decision made by competent counsel, but occurred because the constitutional issue was "reasonably unknown to him" at the time of trial. If counsel had no "reasonable basis upon which to formulate a constitutional question," then this Court could not "attribute to him strategic motives of any sort." *Id.* at 14–15, 104 S.Ct. at 2909. Furthermore, this Court found that the truly novel claim could be excused without implicating any of the ar-

---

**2.** *See also Ex parte Turner,* 542 S.W.2d 187 (Tex. Cr.App.1976). Applicant failed to object to the trial court's denial of compulsory process for obtaining witnesses under then existing Tex. Crim.Proc.Code art. 711 and Tex.Penal Code art. 82. The Supreme Court's later decision in *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) held these statutes un-

constitutional. We found "[i]t would be unreasonable to expect the petitioner to anticipate the future decision of the United States Supreme Court," and held that there was no intentional waiver for failing "to object upon a ground not yet established as a defect of constitutional magnitude." *Turner,* at 189 (citing *Ex parte Casarez,* 508 S.W.2d 620 (Tex.Cr.App.1974)).

ticulated reasons for requiring meticulous preservation of error.

Just as it is reasonable to assume that a competent lawyer will fail to perceive the possibility of raising such a claim, it is also reasonable to assume that a court will similarly fail to appreciate the claim. It is the nature of our legal system that legal concepts, including constitutional concepts, develop slowly, finding partial acceptance in some courts while meeting rejection in others. Despite the fact that a constitutional concept may ultimately enjoy general acceptance, ... when the concept is in its embryonic stage, it will, by hypothesis be rejected by most courts. Consequently, a rule requiring a defendant to raise a truly novel issue is not likely to serve any functional purpose. Although there is a remote possibility that a given state court will be the first to discover a latent constitutional issue and to order redress if the issue is properly raised, it is far more likely that the court will fail to appreciate the claim and reject it out of hand.

*Id.* at 15, 104 S.Ct. at 2910.

In addition, requiring novel claims to be routinely raised could "actually disrupt state-court proceedings by encouraging defense counsel to include any and all remotely plausible constitutional claims that could, some day, gain recognition." *Id.* at 16, 104 S.Ct. at 2910.

As was stated in concurrence in *Ex parte Chambers,* the reasoning of *Reed* is instructive but in no way binding on this Court. The concurrence in *Ex parte Chambers* actually asserts a basis in Texas law for the novelty plank of the "right not recognized" doctrine. Thus, I would look to this Court's application of the novelty doctrine articulated in *Ex parte Chambers* for further guidance.

Post-conviction challenges based on the *Ex parte Chambers* novelty component have arisen largely from belated claims under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1984), *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

In *Mathews v. State,* 768 S.W.2d 731 (Tex.Cr.App.1989), the appellant sought to raise *Batson* error for the first time on appeal. At the time Mathews was tried, *Batson* was pending before the Supreme Court. No objection was made at trial and Mathews offered no evidence that would show prima facie *Batson* error. Thus, this Court faced the question whether a *Batson* claim would be procedurally barred because of a failure to object on *Batson* grounds.

This Court first noted that, in previous cases, we had made exceptions to the contemporaneous objection rule when the error implicated a novel constitutional claim involving a defect of constitutional magnitude not yet established at the time of trial. 768 S.W.2d at 733 (citing *Cuevas v. State, supra; Ex parte Bravo, infra; Cook v. State,* 741 S.W.2d 928 (Tex.Cr.App.1987)). Expanding on this concept, Judge Clinton wrote:

At this juncture, it is appropriate to reiterate that the federal procedural default doctrine also involves a "novelty" test, providing that "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures." This test determines federal cognizability where there has been a procedural default at the state level, and as pointed out in *Chambers, supra,* the federal procedural default doctrine *per se* applies only in federal habeas corpus proceedings. This Court also conducts a "novelty" analysis; however, when we do so, it is to decide whether there need be a contemporaneous objection in the first instance. Finding a constitutional claim sufficiently "novel," we hold there is no procedural default.

*Id.* Noting that the claim in *Ex parte Chambers* involved "novel" *Smith* error, we then distinguished the *Batson* claim in *Mathews* as not so "novel" that appellant's failure to object could be excused. *Id.;*

*Williams v. State,* 773 S.W.2d 525 (Tex.Cr. App.1989).

We addressed a similar question concerning procedural bar in *Ex parte Bravo,* 702 S.W.2d 189 (Tex.Cr.App.1985). In *Ex parte Bravo,* the applicant asserted a claim on the basis of *Adams v. Texas, supra,* even though he had failed to raise the issue on direct appeal. The decision in *Adams* clarified the holding in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and applied that decision to Tex.Penal Code Ann. § 12.31(b). We rejected the State's argument that the applicant was procedurally barred from raising *Adams* error by writ of habeas corpus after failing to raise it on direct appeal. The applicability of *Witherspoon*

to Tex.Penal Code § 12.31(b) was not explained until *Adams.* Thus, we found that applicant was allowed to raise his claim challenging the constitutionality of § 12.-31(b) for the first time on post-conviction review, "because he did not have the opportunity to have his constitutional issue reviewed in the light of the decision in *Adams.*" 702 S.W.2d at 193.[3] *See also Rabb v. State,* 730 S.W.2d 751 (Tex.Cr.App. 1987) (Appellant challenged the Dallas County Magistrate's Act, Tex.Rev.Civ.Stat. art. 1918c (Supp.1985), as an unconstitutional delegation of legislative power. "Questions involving the constitutionality of a statute upon which a defendant's conviction is based should be addressed by appellate courts, even when such issues are raised for the first time on appeal.")[4]

---

**3.** We also distinguished *Bravo* from our decision in *Crawford v. State,* 617 S.W.2d 925 (Tex. Cr.App.1981). *Crawford* involved failure to object to *Witherspoon* error in a capital murder prosecution. Crawford contended that, since *Adams* was decided three years after the improper excusal of the prospective juror in his case, failure to object should be excused. The Court refused to allow Crawford's claim, finding that the record failed to establish that the excused venire person would have been acceptable to the defendant and that he would not have exercised a peremptory challenge on her.

This Court has previously held that where a defect of constitutional magnitude has not been established at the time of trial, the failure of counsel to object does not constitute waiver. *Ex parte Sanders,* 588 S.W.2d 383 (Tex.Cr.App.); *Ex parte Casarez,* 508 S.W.2d 620 (Tex.Cr.App.); *Ex parte Taylor,* 484 S.W.2d 748 (Tex.Cr.App.). Such a holding is bottomed on the premise that there was no tactical or logical reason for counsel's failure to object other than the fact that the defect had not been established at the time of trial. *Id.* at 940. The Court refused to conclude that the only reason for the failure to object was the, as yet, unrecognized defect found in *Adams. Id.*

There seems to be an obvious tension between *Ex parte Bravo* and *Crawford.* In *Ex parte Bravo,* however, the defendant vigorously attempted to rehabilitate the challenged venire person, thus establishing, at least circumstantially, that he would not have used a peremptory challenge.

**4.** The Dallas Court of Appeals addressed a similar issue in *Chitwood v. State,* 703 S.W.2d 360 (Tex.App.—Dallas 1986). *Chitwood* involved a claim of error under *Long v. State,* 694 S.W.2d 185 (Tex.App.—Dallas 1985, no pet.) (holding that Tex.Crim.Proc.Code art. 38.071 § 2 was unconstitutional). The appellant failed to object at

trial on that basis. The court of appeals held that "the *Long* decision [was] a new application of the old right of confrontation. It [was], however, not the 'clear break with the past' … foreseen under the federal test." *Id.* at 361.

The court of appeals further stated that; [w]hile the language employed in *Chambers* is broad, in every Texas case in which the defendant has successfully challenged his conviction based upon a subsequently established constitutional defect, the principle relied upon overruled considerable Court of Criminal Appeals case law or was, in fact, quite novel and an objection based upon it would have been futile.

703 S.W.2d at 361–62.

In addition, the Court found no long-established line of cases indicating that objections to the constitutionality of Tex.Crim.Proc.Code art. 38.071 § 2 would have been futile at the time of trial. *Id.* at 362. The court of appeals held that Chitwood waived his objection to "this *new* and obviously constitutionally *questionable* statute by failing to object to it at trial." 703 S.W.2d at 362. The court reasoned that the statute clearly implicated the right to confrontation, and that the right to confrontation was "too fundamental in our law for an appellant to affirmatively permit the introduction of a video tape and then later claim this right has been violated." *Id.* Defense counsel at trial indicated he had reviewed the tape and had no objections to its admission.

In contrast to the facts in *Chitwood,* Tex.Crim. Proc.Code art. 37.071 has remained in effect despite a number of considerable constitutional challenges. In addition, this Court has consistently refused to require additional instructions concerning the application of punishment evidence.

Applying a procedural bar because the decision of how to approach mitigating evidence

The State contends that *Penry* issues are not novel, relying on the Supreme Court's pronouncements to that effect.[5] The analysis offered in part II.A of the majority opinion, contending that appellant is really advancing a "futility" argument, may be correct. However, this Court's analysis of the issue includes a novelty factor in determining whether to review alleged constitutional violations such as those occurring in *Adams, Long,* and *Smith.*

For example, the United States Court of Appeals for the Fifth Circuit held that the decision in *Estelle v. Smith* "did not establish a new principle of federal constitutional law because that decision merely applied already fixed principles to a new factual situation." The circuit court viewed *Smith* as a logical extension of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its related line of cases. *Battie v. Estelle,* 655 F.2d 692, 699 (5th Cir.1981). In contrast, in his concurrence in *Fields v. State,* 627 S.W.2d 714 (Tex.Cr.App.1982), Presiding Judge McCormick recognized the significant impact of the decision in *Smith* on Texas law:

> Both holdings in *Estelle v. Smith* changed the law in Texas. This Court had for years rejected claims on these bases. Never before had it been held a court-appointed mental health expert must warn a defendant of his right to remain silent and that the evidence adduced in the psychiatric interview could be used against him. Never before had it been held that the defendant's attorney could receive notice before a psychiatric interview on the dangerousness issue could be held. In fact, in numerous cases this Court rejected the contentions that the proceedings used in *Estelle [v. Smith]* violated a defendant's rights.

627 S.W.2d at 723 (McCormick, J., concurring).

This analysis focuses on significant changes in law, and forces the inquiry into whether such changes affect this Court's interpretation of constitutional issues. Perhaps this should be the essential inquiry under the novelty half of the "right not recognized" doctrine. A decision pointing to a marked change from long-held positions by this Court on issues of extreme constitutional importance to capital defendants should normally be considered a novel event. I view the decisions in *Estelle v. Smith* and *Adams v. Texas* as representing a marked change in Texas law. Thus, I would evaluate whether the decision in *Penry* was adequately novel in light of this Court's reaction to those decisions.

### III. Is *Penry* more like *Adams* and *Smith* or *Batson*?

The State argues that appellant's *Penry* claims, like the *Batson* claims urged in *Mathews* and *Williams,* are not novel. The State asserts that the novelty claim being presented is in reality a claim of futility, and that *Penry* claims are analogous to *Batson* claims. I disagree, and do not believe the State's contentions comport with Texas precedent.

*Batson* merely relaxed the evidentiary standards of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). *Penry,* however, applied the constitutional requirements concerning consideration of mitigating evidence found in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) directly to article 37.071. The exact relevance of the *Lockett* and *Eddings* requirements as applied to the

---

could be considered tactical would be unfair. An attorney would not know what instruction would be given to the jury until after all of the evidence had been admitted. Perhaps, a "tactical decision" between two bad alternatives, complicated by reliance on case law now called into question by *Penry* and incomplete information about what ruling to expect from the trial judge, is really no choice at all.

5. The Supreme Court found in *Penry* that the relief sought did not present a new rule under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). This decision was made within the context of federal habeas corpus review of a claim procedurally barred by state law.

The Supreme Court's finding that *Penry* does not impose a new obligation on the State of Texas, however, does not directly control whether *Penry* claims are novel in light of the right not recognized doctrine approved in *Ex parte Chambers.*

special issues of article 37.071 was not addressed until *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1989), and was not fully explained until the decision in *Penry*.

*Batson* error necessarily contemplates an objection. All of the substantive legal arguments relied upon in *Batson* follow directly from *Swain v. Alabama, supra.* *Batson*'s innovation is to force the prosecutor to provide race-neutral reasons for his peremptory challenges once a defendant makes a prima facie showing of racial discrimination. While the modification greatly increases a defendant's chance of obtaining relief, the workings of the entire procedure depend on an objection to start things in motion. Absent a timely objection, the prosecutor has no reason to provide race-neutral explanations, and there is no evidence for the trial judge to weigh. A failure to object on *Batson* grounds results in no evidence of discrimination, no testimony from the prosecution, no trial court ruling, and ultimately nothing for appellate review.

Conversely, *Penry* error can be capably reviewed with or without an objection. Since this Court has never required a special instruction on mitigating evidence, it is difficult to evaluate now the effect that an actual request for a special instruction might have in a particular case. The record can be reviewed on appeal for any relevant mitigating evidence actually presented at trial. This affords the added degree of caution desirable in a death penalty case. I do not believe that the considerations which led us to find waiver of *Batson* error in *Mathews* are present in the many cases now claiming *Penry* error.

IV. Is *Penry* novel in light of this Court's prior decisions?

In at least three cases, this Court affirmed the constitutionality of the special issue practice under article 37.071, essentially rejecting the idea that special instructions may, in some circumstances, be needed to broaden the jury's consideration of mitigating evidence or to allow the jury to give added effect to mitigating evidence.

In *Ex parte Granviel*, 561 S.W.2d 503 (Tex.Cr.App.1978), the applicant argued that article 37.071 was unconstitutional as applied because it prevented the jury from considering his "mental condition as a mitigating factor in relation to the two or possibly three statutory special issues to be submitted to the jury at the penalty stage of a capital murder trial." *Id.* at 516. We rejected his claim reasoning that:

> [t]his court in construing Article 37.071, supra, has never limited admissible evidence to solely aggravating or mitigating circumstances. The phrase "any matter that the court deems relevant to sentence" in Article 37.071(a), supra, refers to virtually any type of probative matter. The only limitation is that the trial court in its discretion must consider the evidence to be relevant to punishment. Moreover, the jury in answering the special issues may properly consider all the evidence adduced during both the guilt and punishment phases of the trial. This could include evidence of a defendant's mental condition—whether such evidence be characterized as an "aggravating" or "mitigating" factor. Thus, Article 37.071(b), supra, does not prevent the jury from considering a defendant's mental condition as a mitigating factor.

*Id.* (footnotes and citations omitted).

The decision in *Ex parte Granviel* reflected no recognition by this Court of the dilemma presented to the jury in deciding how to give "two edged sword" evidence effect. *See Penry*, 109 S.Ct. at 2949. We held that no additional instruction was required to allow full consideration of mitigating evidence of the type that resulted in the decision in *Penry*.

In *Adams v. State*, 577 S.W.2d 717 (Tex. Cr.App.1979), *rev'd on other grounds sub nom., Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), we summarized Adams's argument as follows:

> Appellant contends that Art. 37.071, V.A.C.C.P., is unconstitutional because the punishment issues specified therein, in particular the second issue, "fail to present for the jury's consideration any concept of 'desert,' thus depriving the

defendant of the critical consideration of the jury of any defined standard by which they may decide if the defendant 'ought to die,' this being a requirement of the Constitution as interpreted in *Gregg v. Georgia,* [428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)]." In a related argument, appellant contends that Art. 37.071, supra, is unconstitutional because "there are no provisions for jury lenience if all the special issues are answered affirmatively thus calling for jury negation should the jury believe that under all the circumstances the defendant does not 'deserve' a sentence of death."

Appellant acknowledges that the defendant in a capital case in Texas may offer at the punishment hearing any relevant mitigating evidence. However, appellant argues that such evidence is of no avail to the defendant if the jury is convinced by the evidence beyond a reasonable doubt that the punishment issues should be answered affirmatively. In such a case, appellant argues, the punishment of death is mandatory even though the jury, on the basis of the mitigating evidence, may believe that death is inappropriate.

*Id.* at 729 (citations omitted).

In response to this argument, this Court held:

Although the death penalty in Texas is mandatory upon the return of affirmative answers to the three punishment issues, Art. 37.071, supra, the jury does not consider the punishment issues unless it has first found the defendant guilty of murder under certain specified aggravating circumstances. V.T.C.A. Penal, § 19.03. Furthermore, in answering the punishment issues the jury must consider all the relevant evidence concerning the particular offense and the individual defendant offered by the State or by the accused. The punishment issues give guidance to the jury regarding those factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision. The punishment issues provide for the guided

jury discretion found wanting in pre-*Furman* death penalty statutes....

We hold that Art. 37.071, supra, is not unconstitutional for failure to present for the consideration of the jury the concept of "desert." We also hold that Art. 37.071, supra, does not impose the death penalty in an unconstitutionally mandatory manner.

*Id.* at 730 (citations omitted). While *Granviel* sought to give effect to all mitigating evidence within the existing structure of the special issues, *Adams* sought to give effect to this evidence by adding what amounts to an additional special issue. Our holding in *Adams* reaffirmed the essential idea that article 37.071 allowed the jury full consideration of mitigating evidence without any need for further instructions or modification.

Predictably then, in *Quinones v. State,* 592 S.W.2d 933 (Tex.Cr.App.1980), we held that the refusal of the trial judge to grant a requested instruction on mitigating evidence was not error. We summarized Quinones's argument and responded as follows:

[A]ppellant contends that, in the punishment phase, the jury should have been charged that: "Evidence presented in mitigation of the penalty may be considered should the jury desire, in determining the answer to any of the special issues. Appellant submitted two jury charges incorporating this language and both were denied. The trial court submitted the special issues as prescribed in Art. 37.071, V.A.C.C.P., without explanation of their terms.

Appellant correctly claims a right to consideration of mitigating circumstances by the jury deciding whether or not to impose the death penalty and he argues that the explanatory charge he requested is necessary to protect this right. We disagree with this conclusion. The Supreme Court has affirmed that under the Texas capital sentencing statute: "the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it." *Jurek v. Texas,* 428 U.S. 262, 273, 96

S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976). "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced." 428 U.S. at 276, 96 S.Ct. at 2958. While invalidating an Ohio death penalty statute for its failure to permit adequate consideration of mitigating factors, the Supreme Court favorably contrasted the Texas law which: "survived the petitioner's Eight and Fourteenth Amendment attack because three Justices concluded that the Texas Court of Criminal Appeals had broadly interpreted the second question—despite its facial narrowness—so as to permit the sentencer to consider 'whatever mitigating circumstances' the defendant might be able to show." *Lockett v. Ohio,* 438 U.S. 586, 607, 98 S.Ct. 2954, 2966, 57 L.Ed.2d 973 (1978), citing to *Jurek v. State,* 522 S.W.2d at 939–40.

Appellant was entitled to present evidence of any mitigating circumstances and did present such evidence, including a broad discussion of his personal and family background. The question then is whether the language of the special issue is so complex that an explanatory charge is necessary to keep the jury from disregarding the evidence properly before it. In *King v. State,* 553 S.W.2d 105 (Tex.Cr.App.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978), this Court held that the questions in Art. 37.071 used terms of common understanding which required no special definition. The jury can readily grasp the logical relevance of mitigating evidence to the issue of whether there is a probability of future criminal acts of violence. No additional charge is required. The ground of error is overruled.

*Id.* at 947.

The decisions in *Ex parte Granviel* and *Adams* rejected the argument that under the special issues of article 37.071 the jury is unable to give full effect to relevant mitigating evidence, and in *Quinones* we further refused to recognize any constitu-tional need for a special instruction regarding mitigating evidence.

Had *Penry,* and to a lesser extent *Franklin,* never been decided, *Ex parte Granviel, Adams,* and *Quinones* would have effectively foreclosed the argument that appellant is now making. *Penry* was the first case ever to hold that, under certain circumstances, the Eighth Amendment forbids a death sentence imposed under an unadorned version of article 37.071. For the first time, and contrary to case law from this Court, *Penry* recognized that some capital defendants have an Eighth Amendment right to have mitigating evidence considered *and acted upon* that extends beyond the language of article 37.-071.

## V. Conclusion

Arguing over whether the rule announced by the Supreme Court in *Penry* is novel, or whether the lodging of an objection prior to *Penry* would have been futile, will not bring about an ultimate resolution of this matter. Both the State and appellant advance compelling arguments in both areas. What is strikingly clear, in my view, is that the holding in *Penry* constituted a substantial change in the law, no less than *Adams v. Texas* and *Estelle v. Smith,* and there being abundant *Texas* precedent demonstrating that the holding amounts to a right not previously recognized, appellant has not waived his right to assert a *Penry* violation by failing to object at trial.

Accordingly, I concur in the result reached in Part II.A and join in Parts I and II.B of the lead opinion.

McCORMICK, P.J., and OVERSTREET and BENAVIDES, JJ., join this concurrence.

CLINTON and MALONEY, JJ., join this concurrence in the analysis of Part II.A.

BAIRD, Judge, concurring in part and dissenting in part.

Judge Miller is correct, it was futile for defense counsel to request the trial court to provide the jury with a vehicle to express its reasoned moral response to the mitigating evidence "not relevant to"

and/or "beyond the scope of" the special issues submitted pursuant to Tex.Code Crim.Proc.Ann. art. 37.071. See, *Stewart v. State*, 686 S.W.2d 118, 125 (Tex.Cr.App. 1984) (Clinton, J., joined by Teague and Miller, JJ., dissenting); *Lackey v. State*, 819 S.W.2d 111 (Tex.Cr.App.1989) (Miller, J., dissenting) (opinion on original submission), aff'd at 128 (Tex.Cr.App. delivered this day) (opinion on motion for rehearing). Therefore, I join Part IIA of the majority opinion.

I dissent, however, to Part IIB of the opinion holding no additional instruction was necessary for the jury to express its reasoned moral response to appellant's mitigating evidence. Majority opinion, page 353. Appellant's mitigating evidence establishes the three positive character traits mentioned by Justice O'Connor in her concurring opinion in *Franklin v. Lynaugh*, 487 U.S. 164, 186–88, 108 S.Ct. 2320, 2333, 101 L.Ed.2d 155 (1988) (O'Connor, J., joined by Blackmun, J., concurring): Religious devotion (*Black*, Maj. op. IA at 354), kindness to others (*Black*, Maj. op. IA at 354) and voluntary service (*Black*, Maj. op. IA at 354). Because no additional instruction was submitted, a reasonable juror could well have believed that there was no vehicle for expressing the view that appellant did not deserve to be sentenced to death based upon his mitigating evidence. *Penry v. Lynaugh*, 492 U.S. 302, 324–26, 109 S.Ct. 2934, 2950, 106 L.Ed.2d 256 (1989). Accordingly, I believe our capital sentencing scheme operated in an unconstitutional manner as applied to appellant. See, *Ex parte Baldree*, 810 S.W.2d 213, 217 (Tex. Cr.App.1991 delivered this date) (Baird, J., dissenting); *Boggess v. State*, 1991 WL 87597 (Tex.Cr.App. No. 69,990, delivered this date) (Baird, J., dissenting).

As the majority notes, appellant's evidence is "qualitatively different" than the mitigating evidence in *Penry*, which demonstrated mental retardation and an abusive childhood. If the protections of the Eighth and Fourteenth Amendments are limited to such an extreme situation as *Penry*, then the majority is correct. However, for the reasons stated this date in my dissenting opinion in *Baldree*, 810 S.W.2d at 217 (Baird, J., dissenting), I do not feel *Penry* should be so narrowly construed.

CLINTON, Judge, dissenting.

The plurality opinion would reach the merits of appellant's claim under *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), despite lack of an objection or request in the trial court, on the basis that such an objection or request would have been futile at the time. The plurality cites no authority for this proposition. In his concurring opinion, Judge Campbell agrees the Court should reach the merits, but on a different basis: that at the time of appellant's trial, anything we would now recognize as a valid *Penry* claim was "a right not recognized." Under Judge Campbell's majority concurrence in *Ex parte Chambers*, 688 S.W.2d 483 (Tex. Cr.App.1984), such a claim is cognizable when raised for the first time on appeal or on post-conviction writ of habeas corpus brought pursuant to Article 11.07, V.A.C.C.P., whether or not it was preserved in the trial court. Reasoning that *Penry* "point[ed] to a marked change from long-held positions by this Court on issues of extreme constitutional importance to capital defendants," Judge Campbell concludes it was indeed a right not recognized at the time of appellant's trial. He has thus declared that for any capital case tried before the Supreme Court's decision was handed down, on June 26, 1989, a *Penry* claim will be entertained by this Court irrespective of any procedural default at trial or on appeal.

I agree with Judge Campbell that any forfeiture of *Penry* error is excusable under the holding in *Ex parte Chambers*, supra, and to the extent it so holds, I join his opinion. I write further, however, because I am not at all sure we are correct to assume that *Penry* error can be forfeited in the first place. This depends upon the nature of the Eighth Amendment claim itself, a question that has received little attention in either this Court or, as yet, the

United States Supreme Court. If *Penry* error is of such a nature that it cannot be forfeited, the Court need not invoke its doctrine of excuses, embodied in *Chambers'* "right not recognized" test, in order to reach a *Penry* claim raised for the first time on appeal or on collateral attack.

## I.

The Court has frequently said "that even constitutional guarantees can be waived by failure to object properly at trial." *Gibson v. State,* 516 S.W.2d 406, 409 (Tex.Cr.App. 1974). But surely by this the Court means *some* constitutional rights, not all. For when the Court says "waived" in this context, it does not mean "waiver" in the sense of *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), which is to say, the "intentional relinquishment or abandonment of a known right." What the Court means is that even constitutional guarantees can be forfeited. We know, however, that not all constitutional guarantees can be lost by simple forfeiture. Nevertheless, both the plurality and concurring opinions in this cause assume that *Penry* error can indeed be forfeited. Hence, they proceed to a *Chambers* analysis, to determine whether there is a valid excuse for the forfeiture. Lost in the analysis is the threshold inquiry whether *Penry* error is of such a nature that it can be procedurally defaulted by failure to raise it in the trial court.

The Supreme Court has held that the Texas capital sentencing scheme sometimes operates in a manner inconsistent with requirements of the Eighth Amendment to the United States Constitution. *Penry v. Lynaugh,* supra. The sentencing scheme is not unconstitutional on its face. *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). It does violate the Eighth Amendment, however, at least insofar as this Court understands the matter, under the following circumstances:

> "[W]henever a capital defendant produces evidence of his own character, background, or the circumstances sur-

rounding his offense which, according to contemporary social standards, has a tendency to reduce his moral culpability in a way not exclusively related to the deliberateness of his criminal conduct, the provocative behavior of his victim, or the probability of his future dangerousness, the United States Constitution forbids imposition of the death penalty upon him by a sentencer given no means to prescribe, based on such mitigating evidence, a less severe punishment."

*Gribble v. State,* 808 S.W.2d 65, 75 (Tex.Cr. App.1990). From this it is apparent that we do not necessarily understand the Eighth Amendment to guarantee jury instructions of a particular kind in death penalty cases. Because it is only the sentence of death which even arguably offends the Eighth Amendment, one cannot determine whether the Constitution required a jury instruction until after a sentence of death is imposed. This circumstance alone suggests that the essence of *Penry* may not be the right to a jury instruction. At best, a jury instruction of the kind requested by Penry would, if given, prevent an unconstitutional result.

Thus, we may err to assume that a *Penry* claim must be preserved by way of request for or objection to the absence of a particular instruction. The mistake occurs when we think of *Penry v. Lynaugh,* supra, as holding that a capital accused has a right to an instruction whenever evidence of mitigating value beyond the scope of special issues is presented. The more accurate view may be that *Penry* holds that the Eighth Amendment forbids the imposition of the death penalty by the State whenever the capital sentencer has been precluded from taking all "relevant" mitigating evidence into account in making a reasoned moral judgment whether the accused should live despite the nature of his crime. In short, *Penry* may not represent a right of the accused so much as a fundamental feature of the system.

The point may be illustrated as follows. Suppose an accused is found guilty of capital murder. At the punishment phase he proffers evidence which all can agree has

mitigating significance not cognizable within the statutory special issues. The trial court admits the evidence, then fails to submit to the jury the accused's requested *Penry* instruction. The jury is therefore not equipped to give effect to the mitigating evidence. However, the jury answers one of the special issues 'no,' thus mandating a life sentence under Article 37.071(e), V.A.C.C.P. One interpretation of this scenario is that the accused was entitled to his requested instruction under the Eighth Amendment, the trial court erred to refuse it, but in view of the jury's disposition of the special issues, the error in not giving the instruction was harmless beyond a reasonable doubt (or indeed, beyond all doubt). Another interpretation, however, is that no Eighth Amendment violation has occurred because the State, by due operation of its mechanism for assessing sentence in capital cases, *viz:* Article 37.071, supra, does not propose to carry out the death penalty. Until Article 37.071 does operate to impose the death sentence in spite of factors not presented to the jury that might counsel in favor of a lesser sentence, it has not been unconstitutionally applied. The State has done nothing to controvert the Eighth Amendment. No *Penry* error has occurred.

Which of these perspectives we embrace has a critical impact upon the question of procedural default. For if we perceive *Penry* to hold that an accused has a right to an instruction upon introduction of mitigating evidence beyond the scope of special issues, then it is appropriate to ask whether he can assert that right on appeal or on collateral attack *sans* any request for or objection to the absence of such an instruc-

tion—i.e., whether his right may be procedurally defaulted. On the other hand, if what the Eighth Amendment does is not simply to vest an accused with the right to a jury instruction, but rather to forbid the State from giving effect to its death penalty statute whenever it operates to impose death upon less than all the constitutionally "relevant" criteria, the procedural default question takes on a completely different slant. If *Penry* stands for anything, it is that Article 37.071, by itself, is a constitutionally unreliable mechanism for determining that death is an appropriate penalty whenever evidence is proffered having mitigating potential that transcends its logical relevance to the special issues. Viewed in this latter light, the State is actually the beneficiary of a *Penry* instruction. For it is the State, not the accused, that stands to gain from operation of Article 37.071, supra. A *Penry* instruction ensures that the statute will not operate under any circumstances to violate the Eighth Amendment, irrespective of whether the jury assesses a life or death sentence. Viewing the State as the beneficiary of a *Penry* instruction, surely it makes no sense to reason that an accused forfeits a claim that he has been sentenced to death in violation of the Eighth Amendment because he failed to request the instruction at trial. If either party should have a burden to request a *Penry* instruction, it would more appropriately fall to the State.[1]

That *Penry* itself arose in context of a requested jury instruction, refused by a trial judge, does not necessarily mean that the Eighth Amendment doctrine with which the Supreme Court was there concerned is merely the right to a particular jury in-

---

1. A capital accused might reasonably be expected to object at the point at which a trial court purports to pronounce sentence upon affirmative answers to special issues from a jury that has not received a *Penry* instruction. The function of contemporaneous objection, however, is to afford the trial court an opportunity, perhaps to cure, but at least to rule upon a claimed defect at the time it arises. *Zillender v. State,* 557 S.W.2d 515 (Tex.Cr.App.1977). Once a jury has answered 'yes' to special issues in the absence of a *Penry* instruction, the trial judge is in a bind. He cannot cure the defect. Any ruling he makes will be wholly unsatisfactory. If he

imposes the death penalty pursuant to Article 37.071(e), supra, he violates the Eighth Amendment. He cannot impose a life sentence because, although it would not offend the Eighth Amendment to do so, it would violate Article 37.071(e), supra. To impose no sentence at all likewise violates the mandate of the statute. He could declare a mistrial, but that raises jeopardy questions of enormous complexity. In short, the trial court is in no better position to remedy the situation than an appellate or habeas court would be. An objection at this juncture serves no useful purpose to the system. To require it would truly elevate form over substance.

struction. That is just the posture in which the issue manifested itself given the peculiar nature of our capital sentencing scheme. We cannot tell from the face of the ·Penry opinion whether what it recognizes is a fundamental requirement of the system, a federal constitutional right, but one which is subject to waiver only—i.e., the "voluntary relinquishment of a known right[,]" or instead, merely one of a legion of federal constitutional rights which, though important, as all such rights are, must nevertheless be invoked by the accused at trial before he can complain of its violation on appeal or on collateral attack. Until this question is addressed, it seems to me premature to engage in any inquiry whether, under *Ex parte Chambers*, supra, there is a valid excuse for appellant's failure to object at trial.

Nevertheless, assuming that *Penry* error is forfeitable, I agree with Judge Campbell that such forfeiture may be excused under *Ex parte Chambers*, supra. Therefore, I join his concurring opinion to that extent.

## II.

Turning to the merits of appellant's *Penry* claim, I must dissent to the Court's holding that "no constitutional violation is presented." In the first place, the majority tacitly assumes that as long as it can identify some sense in which that evidence might be said to militate in favor of a "no" answer to one of the special issues, then it is not confronted with *Penry* error. This assumption misses the very essence of the Supreme Court's holding. It may well be that the jury had the opportunity to give effect to a particular item of mitigating evidence within the parameters of special issues. But should that evidence also have some potentially mitigating aspect not accountable under the special issues, we can-

not say that special issues enable the jury to give it *full* consideration and effect. The jury must be empowered to give mitigating evidence all the effect to which it is susceptible before we can say the Eighth Amendment has been satisfied, consonant with the holding in *Penry*. To the extent it suggests otherwise, the majority errs.

The Supreme Court has told us that "the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence." *McCleskey v. Kemp*, 481 U.S. 279, at 304, 107 S.Ct. 1756, at 1773, 95 L.Ed.2d 262, at 286 (1987).[2] "[A]ny aspect of a defendant's character or record and any of the circumstances of the offense" that in reason could persuade a jury to impose a penalty less than death may be said in this context to be "relevant" mitigating evidence.[3] *Lockett v. Ohio*, 438 U.S. 586, at 604, 98 S.Ct. 2954, at 2965, 57 L.Ed.2d 973, at 990 (1978) (Plurality opinion); *Eddings v. Oklahoma*, 455 U.S. 104, at 110, 102 S.Ct. 869, at 874, 71 L.Ed.2d 1, at 8 (1982).

> "Lockett and Eddings reflect the belief that punishment should be directly related to the personal culpability of the criminal defendant. Thus, the sentence imposed should reflect a reasoned *moral* response to the defendant's background, character, and crime rather than mere sympathy or emotion."

*California v. Brown*, 479 U.S. 538, at 545, 107 S.Ct. 837, at 841, 93 L.Ed.2d 934, at 942 (1987) (O'Connor, J., concurring). Evidence invoking a purely sympathetic or emotional response is probably not "relevant." See *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

Evidence of the type appellant proffered is not squarely covered in *Penry v. Ly-*

---

**2.** Emphasis here and throughout is in the original.

**3.** In truth, the concept of "relevancy" in this context seems odd to me. The only material issue, or "fact of consequence," is whether an accused found guilty of a capital crime deserves a sentence less than death. As is the case at the punishment phase of a non-capital prosecution, where the issue is simply "what punishment to assess," this is "a normative process, not intrin-

sically factbound." *Murphy v. State*, 777 S.W.2d 44, at 63 (Tex.Cr.App.1989) (Plurality opinion on State's motion for rehearing). That being the case, it seems to me that "what is 'relevant' to determining proper punishment is more a question of policy than of logic." *Id.* Because it is a question of Eighth Amendment proportions, however, that policy call is ultimately for the United States Supreme Court to make.

*naugh, supra.* Nevertheless, it is not plain to me that jurors would find these facets of appellant's character insignificant in making the normative evaluation whether he deserves to live in spite of his crime. The Supreme Court has not expressly limited its view of "relevant" mitigating evidence to those circumstances necessarily bearing on personal culpability for the particular offense committed or those aspects of the defendant's background or makeup to which his crime may be, at least in part, attributable.[4] See *Skipper v. South Carolina,* 476 U.S. 1, at 4–5, 106 S.Ct. 1669, at 1671, 90 L.Ed.2d 1, at 7 (1986). To the contrary, there is every indication a majority of the Supreme Court believes "[e]vidence of voluntary service, kindness to others, or of religious devotion" to be relevant inasmuch as it "might demonstrate positive character traits that might mitigate against the death penalty." *Franklin v. Lynaugh,* 487 U.S. 164, at 186, 108 S.Ct. 2320, at 2333, 101 L.Ed.2d 155, at 173 (1988) (O'Connor, J., concurring). When the Supreme Court defines evidence as "relevant" for Eighth Amendment purposes, this Court is not at liberty to regard it otherwise.

It avails appellant little that this Court should reach the merits of his *Penry* claim and then give it such short shrift. I respectfully dissent.

---

**4.** Certainly the probability—or, for that matter, the improbability—that a capital defendant would commit future acts of violence that would constitute a continuing threat to society is not a question bearing on his personal culpability for the particular offense on trial. Yet we know that our second special issue provides at least a partial mechanism for jury consideration of what is, in contemplation of the Supreme Court, relevant "mitigating" evidence under the Eighth Amendment. *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).