Cecilia MAYA, Appellant,

v.

The STATE of Texas, Appellee.

Stephen Howard LEM, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 14–95–00220–CR, 14–95–00221–CR.

Court of Appeals of Texas, Houston (14th Dist.).

June 27, 1996.

N.J. 'Jim' Farrell, Winston E. Cochran, Jr., Douglas H. Pettit, Houston, for appellants.

Travis L. McDonald, Jr., Hempstead, for appellee.

Before LEE, HUDSON and EDELMAN, JJ.

## OPINION

HUDSON, Justice.

Stephen Howard Lem and his wife, Cecilia Maya, were charged with attempted murder. A jury convicted Lem of attempted murder and assessed his punishment at confinement in the penitentiary for ten years. Maya was convicted of the lesser included offense of aggravated assault and assessed a probated sentence of seven years. We reverse the judgment of the trial court in each cause.

On the morning of July 4, 1994, Jose Loera and his family were traveling west on Highway 290. By chance, Lem and Maya happened to be traveling the same highway. Loera was driving behind Lem's vehicle when Lem suddenly applied his brakes. Loera swerved to the right and attempted to pass. Lem, however, pulled his vehicle to the right and deliberately blocked Loera's progress. When Loera attempted to pass on the left, this maneuver was similarly blocked by Lem.

When the two vehicles reached the town of Prairie View, Loera managed to pass Lem's automobile at a traffic light. Lem caught up with Loera and began firing a pistol at the back of Loera's Suburban. One of the pas-

sengers in Loera's Suburban then observed Maya grab the wheel while Lem leaned out the window of his car, holding the gun with both hands. Loera told his family to duck as Lem resumed firing. When the gunfire ended, Lem accelerated past Loera. A few moments later, Loera discovered that his three-year-old nephew had been slightly wounded in the hand and chest. Loera stopped at a service station where he summoned the police and emergency medical personnel. The police discovered seven holes in the back door panels and two indentations in the rear bumper. Five .22 caliber bullets penetrated the passenger compartment.

Lem and Maya were arrested a short time later by a Washington County Sheriff's Deputy. A loaded .22 caliber pistol was found in the glove compartment of their car. A .25 caliber automatic pistol was found in Maya's purse, and a .380 caliber handgun was found in a tote bag on the back seat. An unfired .22 cartridge was found on the passenger's side floor.

Lem and Maya retained a single attorney, Gary Heilman, to represent them in a joint trial. They contend Heilman provided ineffective assistance of counsel because (1) his joint representation created a conflict of interest, and (2) his numerous errors and omissions deprived them of effective representation. Because these issues are so intertwined, we will combine our discussion of these two points of error. Maya separately raises two additional points of error challenging the factual and legal sufficiency of the evidence. We will first address the issues regarding Heilman's ineffective assistance of counsel.

■ Ordinarily, our standard of review for ineffective assistance of counsel is the two-prong test set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This test requires an appellant to demonstrate the following: 1) that counsel's representation fell below an objective standard for reasonableness; and 2) that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.,* 466 U.S. at 687, 104 S.Ct. at 2064. The

second prong of the test does not apply, however, when the error under review is an *actual* conflict of interest. *Id.,* 466 U.S. at 692, 104 S.Ct. at 2067. If counsel's performance has been adversely affected by his active representation of conflicting interests, prejudice is presumed. *Cuyler v. Sullivan,* 446 U.S. 335, 345–350, 100 S.Ct. 1708, 1716–19, 64 L.Ed.2d 333. *Also Banda v. State,* 890 S.W.2d 42, 60 (Tex.Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2253, 132 L.Ed.2d 260 (1995).

■ Logic dictates that a single lawyer cannot simultaneously represent the conflicting interests of two clients. *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942). Not all codefendants, however, have conflicting interests, and there is sometimes a tactical advantage to be obtained by presenting a common defense. *Raspberry v. State,* 741 S.W.2d 191, 197 (Tex. App.—Fort Worth 1987, pet. ref'd). Permitting a single attorney, therefore, to represent codefendants does not always violate the constitutional guarantees to effective assistance of counsel,[1] and the mere *possibility* of a conflict of interest is insufficient to impugn a criminal conviction. *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719. We must first determine whether Heilman's representation was encumbered by an *actual* conflict of interest.

■ Lem based his case on the theory of self-defense. His defensive theory was undermined, however, by Maya's written confession. In a statement made shortly after her arrest, Maya said that immediately before the shooting, Lem became angry because Loera was following too closely. Although she attempted to calm her husband, Lem retrieved a .22 caliber pistol from the glove compartment. Maya said she heard Lem utter a vulgarity and say, "I'm gonna shoot him if he does not stop." After becoming further enraged, Lem began firing at Loera's Suburban. When his gun jammed, Lem handed the gun to Maya, and he instructed her to clear the chamber. Maya said she cleared the jam and reloaded the weapon for her husband.

1. *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

When the State offered Maya's confession into evidence, it provided proof of Lem's agitation, anger, and vulgar threats immediately prior to the shooting that are inconsistent with his affirmative defense. Maya's testimony before the jury bolstered her confession and corroborated its accuracy. Because Maya was his client, Heilman could not cross-examine or impeach her. In representing Maya, Heilman tried to delicately minimize her involvement in the incident without shifting the attention and guilt to Lem. This is an impossible task, and the tactic compromised the defense of both clients. These dilemmas represent *actual*, not *possible*, conflicts of interest.

■ Because a criminal defendant has a limited constitutional right to employ counsel of choice, he inherently possesses the power to waive his right to conflict-free counsel.[2] *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988); *Jones v. State*, 728 S.W.2d 469, 472 (Tex. App.—Houston [1st Dist.] 1987, no pet.). However, the waiver of conflict-free counsel is no less significant than the waiver of counsel altogether. Perhaps the greatest trust between men is the trust of giving counsel,[3] and we will not *infer* a waiver of conflicting interests. To be effective, the record must show the defendant is aware of the conflict of interest, realizes the consequences of continuing with such counsel, and knows that he has the right to obtain other counsel. *Ex parte Prejean*, 625 S.W.2d 731, 733 (Tex. Crim.App.1981). Absent an express, voluntary and knowing waiver, an actual conflict of interest that hinders the effectiveness of counsel will mandate a new trial.

At the new trial hearing, Heilman testified he was aware of the potential for conflict of interest from the beginning of his joint representation of Lem and Maya, and had weighed the tactical advantages of separate trials. He also admitted that he did not explain the potential conflict to the appellants in an intelligible manner,[4] and did not know that a conflict of interest could be waived. Heilman further stated that it did not occur to him that the admission of Maya's confes-

---

2. While a trial court has substantial latitude in refusing to accept such waivers, a presumption exists that a defendant is entitled to counsel of his choice and a trial court cannot infringe upon one's constitutional right to counsel unless there is an actual or serious potential for conflict. *See Wheat*, 486 U.S. at 163, 108 S.Ct. at 1699; *Stearnes v. Clinton*, 780 S.W.2d 216, 223 (Tex. Crim.App.1989).

3. Solicitor–General and Lord Chancellor, Sir Francis Bacon, remarked, "For in other confidences men commit the parts of life; their lands, their goods, their children, their credit, some particular affair; but to such as they make their counsellors, they commit the whole: by how much the more they are obliged to all faith and integrity." Bacon, "Essays on Counsels" (THE HARVARD CLASSICS. Ed. Charles W. Eliot. New York: P.F. Collier & Son 1969), at 52.

4. Heilman's testimony at the hearing on appellants' motion for new trial is illuminating:

   Q. Did it ever occur to you in the representation of Mr. and Mrs. Lem that you had a conflict of interest between Stephen and Cecilia?
   A. I would say so. It occurred to me. Yes.
   Q. When do you think it occurred to you?
   A. Well, I knew, you know, that there was something like that, however, I think that I didn't use the words of art as we do, you know, it was more like inferences, which, you know, they don't know inferences, but

words of art, you know, like conflict of interest, I did not use those words for them.

   \* \* \* \* \* \*
   Q. And after you found out [Maya's] statement was going to be used in the trial of the case, did it occur to you that then there may be a conflict of interest between Mrs. Lem and Mr. Lem?
   A. I don't think—I don't think I realized that. I think that got by me. Yes.

   \* \* \* \* \* \*
   Q. Okay. When do you think you first learned that was a conflict?
   A. I think, you know, initially when I met them, as I said it, I didn't use the terms of art, you know, as conflict of interest but used more inferences to them which they, you know, you know what I mean, because we had talked about separate trials and stuff like that. So instead of using the words conflict of interest, I used more of the inferences, which they may have not realized, being lay people. I suspect they wouldn't have even known.

   \* \* \* \* \* \*
   Q. And do you have any question whether or not you think Mr. and Mrs. Lem was [sic] aware of any conflict of interest in this case?
   A. I suppose. Like I said, I didn't use the terms of art in that. If there was inferences, I suppose it could have got by them very easily.

sion might present a conflict of interest between Lem and Maya. Heilman stated, "I think that got by me." Heilman did not advise his clients of the husband-wife privilege, nor did he realize that he could not impeach one client to further the interests of another client.[5] Finally, the record does not contain an express waiver of conflict-free counsel.

Apart from the conflict of interest, appellants offer numerous examples of alleged errors and omissions to support their contention that Heilman was incompetent and provided ineffective assistance of counsel. We must first determine whether his conduct fell below an objective standard of reasonableness, based on prevailing professional standards. *DeLuna v. Lynaugh*, 873 F.2d 757 (5th Cir.), *cert. denied*, 493 U.S. 900, 110 S.Ct. 259, 107 L.Ed.2d 208 (1989).

Prior to trial, Heilman filed a motion to suppress Maya's written statement. When the motion was overruled, Heilman attempted to take an impermissible interlocutory appeal. He later admitted at the new trial hearing that he believed he could prevent the State from introducing the statement into evidence by simply giving notice of appeal.[6]

Heilman next sought a favorable plea agreement from the State. When the prosecutor refused to negotiate, Heilman said he investigated the possibility of doing "something fancy," and going "past the District Attorney" by attempting to negotiate a deal directly with the trial judge. This maneuver was properly rebuffed by the trial court,[7] and Heilman appears to have been unprepared for trial. Heilman testified that he did not believe the case would go to trial on its first trial setting, and he admitted that he "could have been more prepared." Heilman boasted, however, that he is always ready for trial, and he proudly cited examples where he had tried cases within 24 hours after being retained.

When asked if he knew the number of peremptory challenges available to him in a joint trial, Heilman speculated that he had five peremptory strikes available for each defendant or a total of 10 peremptory challenges. In fact, Heilman had 12 peremptory challenges. TEX.CODE CRIM.PROC.ANN. art. 35.15 (Vernon Supp.1996). He exercised only five. Of particular note is Heilman's failure to use a peremptory challenge against

---

**5.** Maya's appellate counsel asked Heilman the following questions:

> Q. You are familiar with what cross examination is?
> A. Sure.
> Q. Did you have an opportunity to cross examine Mrs. Lem on behalf of Mr. Lem?
> A. I probably had the opportunity, but I don't know if I did.
> Q. You called Mrs. Lem as a witness?
> A. Yes.
> Q. Can you cross examine your own witness?
> A. I suppose if she was—what do you call it, a, a, if she was opposing me, if she became an opposition witness, I could. I don't know the terms of art for that right know [sic].
> Q. Could you cross examine Mr. Lem on behalf of Mrs. Lem?
> A. I suppose if he became, what do you call it—I don't know the words of art for that. I can't think of it right now.
> Q. Adverse witness or hostile witness?
> A. Exactly. Hostile.
> Q. But he is your client, Mr. Heilman?
> A. That is true.
> Q. How could you do that?
> A. That is a very good point, sir, and that is the problem.
> Q. Mrs. Lem was your client?
> A. That is true.

> Q. You accepted a fee to represent both parties?
> A. True.
> Q. Do you know pursuant to the disciplinary rules of the state of Texas whose duty it is to disclose to the Court a potential conflict of interest?
> A. I would definitely say it is was mine.
> Q. Did you do that?
> A. No, sir.

**6.** Ordinarily, appeals in criminal cases may be taken by a defendant only after sentence has been imposed. TEX.R.APP.P. 41(b). While the State has a limited right to take an interlocutory appeal from certain orders, the only interlocutory review available to a defendant is via an appeal from the denial of a pretrial writ of habeas corpus complaining of prosecutions barred by double jeopardy or limitations, or prosecution under a void statute. *See Ex parte Matthews*, 873 S.W.2d 40, 41–43 (Tex.Crim.App.1994).

**7.** A trial judge cannot participate in any plea bargain discussions until an agreement has been reached between the prosecutor and the defendant. *Perkins v. Court of Appeals*, 738 S.W.2d 276, 282 (Tex.Crim.App.1987); *Ex parte Williams*, 704 S.W.2d 773, 777, n. 6 (Tex.Crim. App.1986).

the mother of a state trooper. Normally, his decision could be excused as trial strategy, but Heilman subsequently elicited testimony from Lem suggesting that the officer who searched him after his arrest might have been a homosexual. Further, Heilman elicited testimony from Maya that the officer who took her confession was a liar. If Heilman interviewed his clients prior to trial, he should have reasonably anticipated this testimony. While the utilization of peremptory challenges is an uncertain art, it is difficult to see how the defense was enhanced by leaving the mother of a police officer on the jury.

When Heilman attempted to question a State's witness regarding whether he had prior convictions as provided by the Rules of Criminal Evidence, Heilman, either through ignorance or ineptitude, failed to lay the proper predicate. See TEX.R.CRIM.EVID. 609. His sole question was, "Have you ever been in trouble before?" The question was properly disallowed by the trial court.[8]

Through her testimony, Maya disclosed statements made by Lem that could possibly have been excluded from evidence under the husband-wife privilege. TEX.R.CRIM.EVID. 504. Heilman admitted that he never discussed the marital privilege with Lem and Maya, and said that this potential defense tactic simply "got by me."

Even though it is well established that the use of a non-testifying codefendant's confession against a defendant deprives him of his constitutional right of confrontation, Heilman did not object when the State introduced Maya's confession into evidence. See Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987); Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). If Maya had not testified, Lem would have been entitled to redaction of all portions of Maya's statement regarding his participation in the crime. When asked about his understanding of the admissibility of a nontestifying codefendant's confession, Heilman replied, "You will have to jog my memory."

The Code of Criminal Procedure plainly states that all motions for continuance must be sworn to by a person have personal knowledge of the facts relied on for the continuance. TEX.CODE CRIM.PROC.ANN. art. 29.08 (Vernon 1989). Heilman filed an *unsworn* motion for continuance during the middle of trial to secure the attendance of a defense witness identified only as "the head jailer."

■ On two occasions, Heilman attempted to improperly intimidate witnesses. While there are occasions when a witness may be reminded of the penalties for testifying falsely, such admonitions must never be made for the purpose of threatening or intimidating a witness to change his testimony. Davis v. State, 831 S.W.2d 426, 437–38 (Tex.App.— Austin 1992, pet. ref'd). When Loera denied provoking the difficulty with Lem, Heilman said, "Is it possible to remind him, Your Honor, that he is under oath? And if we do prove that up later, it [sic] could be up for perjury?" When he was unable to impugn the testimony of another State's witness, Heilman warned her that he had an "outside" witness who had seen the incident. Heilman never subpoenaed, called, or produced the phantom witness. The tactic appears in the record as a naked attempt to intimidate a witness by improperly injecting before the jury the false suggestion that another witness exists who could contradict her testimony.

■ Similarly, it is improper for an attorney to inject facts during jury argument that are neither in evidence nor inferable from the evidence. ,See Borjan v. State, 787 S.W.2d 53, 57 (Tex.Crim.App.1990); Navarro v. State, 810 S.W.2d 432, 437–38 (Tex.App.— San Antonio 1991, pet. ref'd). Yet, in his jury argument, Heilman attempted to introduce new facts outside the record. Heilman asserted that Lem could not have known there were children in the rear of Loera's Suburban because he had personally inspected Loera's vehicle and discovered that its windows were heavily tinted. He also ar-

---

8. The Rules of Criminal Evidence provide that impeachment of a witness by conviction of a crime is limited to felonies and misdemeanors involving moral turpitude within the last ten years. TEX.R.CRIM.EVID. 609.

gued that incarcerating the appellant would be the equivalent of a death sentence due to the AIDS virus. No testimony was offered to substantiate these claims.

■ While it is true that some cases cannot be won, an attorney must evaluate a case and do the best he can with the facts. *Rockwood v. State*, 524 S.W.2d 292, 293 (Tex. Crim.App.1975). A defendant is not entitled to a perfect trial, and isolated errors do not ordinarily render counsel's performance ineffective. *McFarland v. State*, 845 S.W.2d 824, 843 (Tex.Crim.App.1992), *cert. denied*, 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993); *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex.Crim.App.1990). Here the errors of counsel are not isolated, but are interwoven throughout the defensive tapestry. The record demonstrates an unpreparedness for trial, ignorance of criminal law, and an unsettling absence of ethical standards. Based on prevailing professional standards, we have no difficulty finding that counsel's performance fell well below the objective standard of reasonableness.

■ Moving to the second prong of the *Strickland*, we must decide whether the result of the proceeding could have been different but for counsel's unprofessional errors. The use of deadly force is not authorized to prevent "tailgating." It is hard to conceive of a more senseless and inexcusable act than discharging a firearm into an automobile in retaliation for a perceived infringement of driver etiquette. While a competent attorney might have prevented the use of Maya's confession against Lem, it seems irrefutable that Lem fired at least nine shots into the rear of a moving vehicle. Lem and Maya's conduct nearly resulted in tragedy, and it is difficult to imagine any attorney mounting a successful defense to their conduct. The punishment assessed by the jury was not unreasonable, and it is unlikely that a new trial will produce a substantially different result.[9]

While we do not believe the errors raised by appellants satisfy the second prong of *Strickland*, we are nevertheless obliged to reverse the convictions under the authority of *Cuyler* for Heilman's failure to advise his clients regarding his conflict of interest and to expressly obtain a waiver of conflict-free counsel.[10] Accordingly, appellants' first point of error is sustained, and the second point of error is overruled.

■ Maya's additional points of error contend the evidence was legally and factually insufficient to support the jury's verdict. When reviewing sufficiency of the evidence, this Court must decide "whether, after viewing the evidence in the light most favorable to the prosecution any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Garrett v. State*, 851 S.W.2d 853, 857 (Tex.Crim. App.1993) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

■ The trier of fact can look to events before, during, and after the commission of an offense to determine whether a defendant is guilty under the law of parties. *Alexander v. State*, 607 S.W.2d 551, 553 (Tex. Crim.App.1980). A witness testified that he saw Maya holding the wheel of the car while Lem discharged his firearm. Maya testified

9. Article I, section 10 of the Texas Constitution does not create a standard of review that is more protective of a defendant's rights than the standard established in *Strickland*. *Black v. State*, 816 S.W.2d 350, 356 (Tex.Crim.App.1991), *cert. denied*, 504 U.S. 992, 112 S.Ct. 2983, 119 L.Ed.2d 601 (1992).

10. We are unable to say that but for counsel's unprofessional conduct the results of the trial would have been different. But if counsel did not harm his clients, he certainly impaired the pursuit of justice. A new jury will have to be assembled in this case, and the witnesses will have to be recalled. The prosecutor must present his case again, and scarce judicial resources will be taxed. If a new conviction is obtained, there will most likely be another appeal. In the interim, public confidence in the criminal justice system will diminish. The bench and bar must do all in their power to prevent a recurrence of this scenario.

Lawyers are required by Rule 8.03 of the Texas Disciplinary Rules of Professional Conduct to report to the appropriate disciplinary authority the conduct of any attorney that raises a *substantial* question as to a lawyer's honesty, trustworthiness, or fitness as a lawyer. Because counsel's conduct in this case raises a substantial question of his fitness as an attorney, a copy of this opinion has this day been transmitted to the local Grievance Committee of the State Bar of Texas.

that she assisted Lem by reloading the pistol. These facts are sufficient to justify the jury's conclusion that Maya was a party to the offense. Maya's third point of error is overruled.

■ Under a factual review of the sufficiency of the evidence we must view all of the evidence and set aside the verdict if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim.App.1996). Maya denied holding the steering wheel during the attack on the Loera family. She argues, however, that taking control of the wheel might have been the safe and prudent action under the circumstances, and that this conduct does not necessarily demonstrate an intent to assist, aid, or encourage her husband.

After examining all of the evidence, we believe the jury correctly resolved the factual issues against appellant. However, even if we believed otherwise, we are not free to reweigh the evidence and set aside a jury verdict merely because we feel a different result is more reasonable. *Clewis*, 922 S.W.2d at 135. Rather an appellate court should only exercise its fact jurisdiction to prevent a manifestly unjust result. *Id.* Finding the verdict to be just and proper, we overrule Maya's fourth point of error.

The judgments are reversed and both causes are remanded for a new trial.